# EXHIBIT 1

**PROMISSORY NOTE**
**(Facility A)**

$10,736,000.00                                                                                    September 2, 2022

FOR VALUE RECEIVED, PAEX LANDMARK SQUARE PA LP, a Pennsylvania limited partnership (hereinafter referred to as "**Borrower**"), unconditionally promises to pay to the order of MERCHANTS BANK OF INDIANA, having a principal banking office at 410 Monon Boulevard, 5th Floor, Carmel, Indiana 46032 (hereinafter referred to as "**Lender**"), at its principal banking offices or at such other place or to such other party as Lender may from time to time designate, the principal sum of Ten Million Seven Hundred Thirty-Six Thousand and 00/100 Dollars ($10,736,000.00), or so much thereof as shall be advanced to or for the benefit of Borrower, with interest on the principal balance from time to time remaining unpaid as provided for in this Note.

**TERMS, PROVISIONS AND CONDITIONS**

1. <u>Definitions</u>. In addition to the words and phrases defined elsewhere in this Note, the following terms shall have the meaning indicated when capitalized and used herein:

"**Adverse REMIC Event**" shall mean either (a) a loss of status as a REMIC within the meaning of Section 860D of the Code, for any group of assets identified as a REMIC, or (b) the imposition of any tax, including the tax imposed under Section 860F(a)(1) of the Code on prohibited transactions, and the tax imposed under Section 860G(d) of the Code on certain contributions to a REMIC.

"**Adverse Tax Event**" shall mean (1) an alteration of this Note resulting in an exchange under Treasury Regulations section 1.1001-3(a), (2) an Adverse REMIC Event to any holder of this Note or a portion thereof that is a REMIC, or (3) an event that results in a holder of the Note or a portion thereof that is a grantor trust being treated as having a power under the trust agreement to vary the investment of the certificate holders under Treasury Regulations section 301.7701-4(c)(1).

"**Affiliate**" shall mean any Person who, directly or indirectly through one or more intermediaries, is in control of, is controlled by, or is under common control with, another Person. For purposes of this definition, a Person shall be deemed to be "controlled by" another Person if another Person or a director, officer, shareholder or employee of another Person possesses, directly or indirectly, power to (i) vote 10% or more of the securities having ordinary voting power for the election of directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the legal representative, successor or assign of any such Person. In addition, if such Person is an individual, any member of the immediate family (including parents, spouse, children and siblings) of such individual and any trust whose principal beneficiary is such individual or one or more members of such immediate family shall be deemed to be an Affiliate of such Person.

"**Applicable Rate**" shall mean the rate of interest which the terms of this Note expressly provide shall be in effect from time to time with respect to the principal outstanding under this Note.

"**Basis Points**" shall mean an arithmetic expression of a percentage measured in hundredths of a percent (i.e., 50 Basis Points equals one half of one percent).

"**Benchmark Replacement**" shall mean the first alternative set forth in the order below that can be determined by Lender as of the Benchmark Replacement Date:

(a) the sum of: (1) the alternate rate of interest that has been selected or recommended by the Relevant Governmental Body as the replacement for the then-current Index and (2) the Benchmark Replacement Adjustment;

(b) the sum of: (1) the ISDA Fallback Rate and (2) the Benchmark Replacement Adjustment; or

(c) the sum of: (1) the alternate rate of interest that has been selected by Lender as the replacement for the then-current Index giving due consideration to any industry-accepted rate of interest as a replacement for the then-current Index for U.S. dollar-denominated floating rate securities at such time and (2) the Benchmark Replacement Adjustment.

"**Benchmark Replacement Adjustment**" shall mean the first alternative set forth in the order below that can be determined by Lender as of the Benchmark Replacement Date:

(a) the spread adjustment (which may be a positive or negative value or zero), or method for calculating or determining such spread adjustment, that has been selected or recommended by the Relevant Governmental Body for the applicable Unadjusted Benchmark Replacement;

(b) if the applicable Unadjusted Benchmark Replacement is equivalent to the ISDA Fallback Rate, the ISDA Fallback Adjustment; or

(c) the spread adjustment (which may be a positive or negative value or zero) that has been selected by Lender giving due consideration to any industry-accepted spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the then-current Index with the applicable Unadjusted Benchmark Replacement for U.S. dollar-denominated floating rate securities at such time.

"**Benchmark Replacement Conforming Changes**" shall mean, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to Interest Adjustment Periods, the timing and frequency of determining rates and making payments of interest, rounding of amounts or tenors, and other administrative matters) that Lender decides may be appropriate to reflect the adoption of such Benchmark Replacement in a manner substantially consistent with market practice

(or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice for use of the Benchmark Replacement exists, in such other manner as Lender determines is reasonably necessary).

**"Benchmark Replacement Date"** shall mean the earliest to occur of the following events with respect to the then-current Index (including the daily published component used in the calculation thereof):

    (a)    in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (1) the date of the public statement or publication of information referenced therein and (2) the date on which the administrator of the Index permanently or indefinitely ceases to provide the Index (or such component); or

    (b)    in the case of clause (c) of the definition of "Benchmark Transition Event," the date of the public statement or publication of information referenced therein.

For the avoidance of doubt, if the event that gives rise to the Benchmark Replacement Date occurs on the same day as, but earlier than, the Reference Time in respect of any determination, the Benchmark Replacement Date will be deemed to have occurred prior to the Reference Time for such determination.

**"Benchmark Transition Event"** shall mean the occurrence of one or more of the following events with respect to the then-current Index (including the daily published component used in the calculation thereof):

    (a)    a public statement or publication of information by or on behalf of the administrator of the Index (or such component) announcing that such administrator has ceased or will cease to provide the Index (or such component), permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Index (or such component); or

    (b)    a public statement or publication of information by the regulatory supervisor for the administrator of the Index (or such component), the central bank for the currency of the Index (or such component), an insolvency official with jurisdiction over the administrator for the Index (or such component), a resolution authority with jurisdiction over the administrator for the Index (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for the Index, which states that the administrator of the Index (or such component) has ceased or will cease to provide the Index (or such component) permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the Index (or such component); or

(c) a public statement or publication of information by the regulatory supervisor for the administrator of the Index announcing that the Index is no longer representative.

"**Beneficial Owner**" and "**Beneficial Owners**" shall mean, individually and collectively, each member, shareholder, or partner of Borrower and any other person or entity who owns or holds a direct or indirect legal or beneficial interest in Borrower.

"**Business Day**" shall mean any day of the week (but not a Saturday, Sunday or holiday) on which the offices of Lender are open to the public for carrying on substantially all of Lender's business functions. Unless specifically referenced in this Note as a Business Day, all references to "days" shall be to calendar days.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Default Rate**" shall mean a per annum rate of interest equal to four percent (4%) above the interest rate otherwise in effect under Section 2.1 of this Note, not to exceed, however, the Maximum Rate. In the event there is more than one rate of interest in effect under this Note as a result of different interest rates applying with respect to different portions of the principal balance outstanding under this Note, then the Default Rate of interest shall be equal to a rate per annum which is four percent (4%) above the highest rate of interest otherwise in effect under Section 2.1 of this Note, not to exceed, however, the Maximum Rate.

"**Determination Date**" shall mean, with respect to any determination of the Index Rate applicable to an Interest Adjustment Period:

(a) If the Index is Term SOFR, the time determined by Lender in its sole discretion on the date that is the U.S. Government Securities Business Day two Business Days preceding such Interest Adjustment Period;

(b) If Term SOFR does not so appear on such day, the time determined by Lender in its sole discretion on the date that is the first preceding U.S. Government Securities Business Day for which such rate was published by the Index Source; or

(c) If the Index is a Benchmark Replacement, the date and time determined by Lender in accordance with the Benchmark Replacement Conforming Changes.

"**Event of Default**" shall have the meaning as defined in Section 11 of this Note.

"**Fee Letter**" shall have the meaning for such term as defined in the Loan Agreement.

"**Floating Interest Rate**" shall mean the variable annual interest rate calculated for each Interest Adjustment Period so as to equal the Index Rate for such Interest Adjustment Period (such rate shall be expressed as a percentage rounded, if necessary, to a multiple of

1/100 of a percent (0.01%)) plus the Margin. Notwithstanding anything expressed or implied herein to the contrary, the Floating Interest Rate shall never be deemed to be less than three and 75/100 percent (3.75%).

"**FRBNY's Website**" shall mean the website of the Federal Reserve Bank of New York, currently at https://apps.newyorkfed.org/markets/autorates/sofr-avg-ind, or at such other page as may replace such page on the FRBNY's Website.

"**Governmental Authority**" shall mean any foreign governmental authority, the United States of America, any State of the United States and any political subdivision of any of the foregoing and any agency, department, commission, board or bureau or court which has jurisdiction over Lender or Borrower or their respective assets or property, including the loan evidenced hereby, or is charged with the interpretation or administration of any law, rule, regulation or treaty which affects the ability of Lender to establish a loan.

"**Index**" shall mean:

    (a)    the SOFR Rate, or

    (b)    if Lender determines that a Benchmark Transition Event has occurred, then beginning on each Benchmark Replacement Date, the Index shall mean the applicable Benchmark Replacement.

"**Index Rate**" shall mean, for any Interest Adjustment Period, the Index published by the Index Source on the Determination Date.

"**Index Source**" shall mean:

    (a)    If the Index is Term SOFR, such source as selected by Lender in its sole discretion.

    (b)    If the Index is a Benchmark Replacement, such source as contemplated by the definition of "Benchmark Replacement".

    (c)    If the then-current Index Source ceases to publish the Index, such other source selected by Lender in its sole discretion.

"**Installment Due Date**" shall mean, for any monthly installment of interest, the date on which such monthly installment is due and payable pursuant to Section 3 of this Note.

"**Interest Adjustment Period**" shall mean a period extending from (and including) the tenth (10th) day of each calendar month during which any portion of the principal balance of this Note is outstanding and ending on (and including) the ninth (9th) day of the following calendar month, provided however, if the effective date of this Note occurs other than on the tenth (10th) day of a calendar month, then the initial Interest Adjustment Period shall be the period which begins with the effective date of this Note and ends on (and

including) the ninth (9th) day of the calendar month following the month in which the effective date of this Note occurs.

"**ISDA Definitions**" shall mean the 2006 ISDA Definitions published by the International Swaps and Derivatives Association, Inc. or any successor thereto, as amended or supplemented from time to time, or any successor definitional booklet for interest rate derivatives published from time to time.

"**ISDA Fallback Adjustment**" shall mean the spread adjustment (which may be a positive or negative value or zero) that would apply for derivatives transactions referencing the ISDA Definitions to be determined upon the occurrence of an index cessation event with respect to the Index.

"**ISDA Fallback Rate**" shall mean the rate that would apply for derivatives transactions referencing the ISDA Definitions to be effective upon the occurrence of an index cessation date with respect to the Index for the applicable tenor excluding the applicable ISDA Fallback Adjustment.

"**Last Floating Interest Rate**" shall mean the Floating Interest Rate determined as of the date Lender elects to replace the Floating Interest Rate with the Prime Equivalent Rate in accordance with Section 2.5 of this Note.

"**Lease Assignment**" shall have the meaning for such term as defined in the Loan Agreement.

"**Loan Agreement**" shall mean that certain Loan Agreement (Facility A) dated of even date herewith, executed by and between Borrower and Lender, and/or any direct or remote agreement amending or restating such Loan Agreement, as from time to time amended or modified.

"**Loan Document**" and "**Loan Documents**" shall mean individually and collectively, this Note, the Security Instrument, the Loan Agreement and all other agreements, security instruments and guaranties which secure or extend to this Note or are executed in connection with the indebtedness evidenced by this Note, as such documents and agreements may be modified or amended from time to time and/or any documents and agreements which replace or restate such documents and agreements.  Loan Documents shall also include, if applicable, any instrument, agreement or document executed in connection with any "Rate Management Transaction" (as that term is defined in the Security Instrument) now or hereafter entered into by and between Borrower and Lender.

"**Margin**" shall mean three hundred fifty (350) Basis Points.

"**Maturity Date**" shall mean the earliest to occur of (i) September 10, 2025, or (ii) the date on which the outstanding principal balance of this Note otherwise becomes due and payable, whether by declaration or acceleration upon the occurrence and during the continuance of an Event of Default or by other circumstances.

"**Maximum Rate**" shall mean the maximum rate of interest permitted by applicable law to be in effect from time to time under this Note.

"**Note**" shall mean this Promissory Note (Facility A), as from time to time amended or modified.

"**Person**" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or government (whether national, federal, state, county, city, municipal or otherwise, including without limitation, any instrumentality, division, agency, body or department thereof).

"**Premises**" shall have the meaning for such term as set forth in the Security Instrument.

"**Prime Base Rate**" shall mean the Prime Rate as of the date Lender elects to replace the Floating Interest Rate with the Prime Equivalent Rate in accordance with Section 2.5 of this Note.

"**Prime Differential Amount**" shall mean the positive difference between the Prime Base Rate and the Prime Rate, as of the date of any change in the Prime Rate.

"**Prime Equivalent Rate**" shall mean, as of any date of determination of a Prime Differential Amount, (i) in the event that the Prime Rate is equal to or greater than the Prime Base Rate, the Prime Equivalent Rate shall equal the Last Floating Interest Rate plus the Prime Differential Amount, or (ii) in the event that the Prime Rate is less than the Prime Base Rate, the Prime Equivalent Rate shall equal the Last Floating Interest Rate minus the Prime Differential Amount.  Notwithstanding anything expressed or implied herein to the contrary, the Prime Equivalent Rate shall never be deemed to be less than three and 75/100 percent (3.75%).

"**Prime Rate**" shall mean a per annum rate of interest equal to the rate which Lender determines, in its reasonable discretion, is approximately the average base rate charged by large U.S. money center commercial banks on corporate loans.  Lender may make such determination based on the rate reported by any publicly available source of market data selected by Lender that, in its reasonable judgment, accurately reflects the approximate average base rate charged by large U.S. money center commercial banks on corporate loans, including without limitation any of the following sources which Lender may select to use in its sole discretion: (i) the Wall Street Journal, "Money Rates" table, (ii) Bloomberg Financial Markets, or (iii) such other comparable financial information reporting service used by Lender at the time such rate is determined.

"**Rate Management Transaction**" shall have the meaning for such term as set forth in the Security Instrument.

"**Reference Time**" with respect to any determination of the Index shall mean (1) if the Index is SOFR, the Determination Date, and (2) if the Index is not SOFR, the time

determined by Lender after giving effect to the Benchmark Replacement Conforming Changes.

"**Regulation D**" shall mean Regulation D of the Board of Governors of the Federal Reserve System from time to time in effect and shall include any successor or other regulation relating to reserve requirements applicable to member banks of the Federal Reserve System.

"**Regulation K**" shall mean Regulation K of the Board of Governors of the Federal Reserve System from time to time in effect and shall include any successor or other regulation relating to reserve requirements applicable to member banks of the Federal Reserve System.

"**Regulatory Change**" shall mean, with respect to Lender, any change after the effective date of this Note in federal, state or foreign law or regulations (including Regulation D) or the adoption or making after such date of any interpretation, directive or request applying to a class of banks including Lender of or under any federal, state or foreign law or regulations (whether or not having the force of law and whether or not failure to comply therewith would be unlawful) by any Governmental Authority or monetary authority charged with the interpretation or administration thereof.

"**Relevant Governmental Body**" shall mean the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**Security Instrument**" shall have the meaning for such term as defined in the Loan Agreement.

"**SOFR**" shall mean the Secured Overnight Financing Rate.

"**SOFR Adjustment Conforming Changes**" shall mean with respect to the SOFR Rate any technical, administrative or operational changes (including changes to the timing and frequency of determining rates and making payments of interest, rounding of amounts or tenors, and other administrative matters) that Lender decides, from time to time, may be appropriate to adjust such SOFR Rate in a manner substantially consistent with or conforming to market practice (or, if Lender decides that adoption of any portion of such market practice is not administratively feasible or if Lender determines that no market practice exists, in such other manner as Lender determines is reasonably necessary).

"**SOFR Rate**" shall mean Term SOFR.

"**Term SOFR**" shall mean the forward-looking term rate with a tenor of approximately one calendar month based on SOFR that is selected or recommended by the Relevant Governmental Body, and may initially be increased or decreased by a spread adjustment value that is either (i) set or recommended by the Relevant Governmental Body for such term rate or (ii) determined in accordance with the methodology endorsed by the Relevant Governmental Body for such term rate.

"**U.S. Government Securities Business Day**" shall mean any day except for a Saturday, a Sunday or a day on which the Securities Industry and Financial Markets Association (or a successor organization) recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in U.S. government securities.

"**Unadjusted Benchmark Replacement**" shall mean the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

The meanings given to a term defined herein shall apply equally to the singular and plural forms thereof.

2. <u>Interest Rate</u>.

2.1. <u>Computation of Interest</u>. The principal balance of this Note from time to time outstanding shall bear interest as follows:

(a) The principal balance of this Note from time to time outstanding shall bear interest at the Floating Interest Rate, unless and except to the extent that the Prime Equivalent Rate or the Default Rate is applicable in accordance with the terms and provisions of this Note.

(b) So long as both (i) any condition for the use of the Prime-Equivalent Rate set forth in Section 2.5 of this Note applies and (ii) a Benchmark Transition Event and the related Benchmark Replacement Date shall not have occurred with respect to the then-current Index, the principal balance of this Note from time to time outstanding shall bear interest at the Prime-Equivalent Rate unless and except to the extent that the Default Rate is applicable in accordance with the terms and provisions of this Note.

(c) Lender will have the right, from time to time and in Lender's sole discretion, to make SOFR Adjustment Conforming Changes. Notwithstanding anything to the contrary in this Note or in any other Loan Documents, any amendments to this Note or the other Loan Documents implementing such SOFR Adjustment Conforming Changes will become effective and binding on Borrower upon notice by Lender to Borrower without the necessity of any action by or consent of Borrower or any Guarantor.

(d) Reserved.

(e) Lender's determination with respect to the following matters will be conclusive and binding on Borrower: (A) the Index Source, and (B) any SOFR Adjustment Conforming Changes. Each such determination will be in Lender's sole discretion.

2.2. <u>Application of Default Rate of Interest</u>. Notwithstanding anything expressed or implied herein to the contrary, the principal balance of this Note from time to time outstanding shall bear interest at the Default Rate during the following times: (i)

during any period in which an Event of Default exists hereunder, and (ii) from and after the Maturity Date.

2.3. 360-Day Year. Interest shall be calculated daily on the basis of a 360-day year applied to the actual number of days in each interest-payment period.

2.4. Limited to Maximum Rate. Notwithstanding anything expressed or implied herein to the contrary, if at any time the Applicable Rate exceeds the Maximum Rate, then the rate of interest on this Note shall be limited to the Maximum Rate, but any subsequent reduction in the Applicable Rate shall not reduce the rate of interest on this Note below the Maximum Rate until the total amount of interest accrued on this Note equals the amount of interest which would have accrued if the Applicable Rate had at all times been in effect.

2.5. Use of Prime Equivalent Rate. If, with respect to any Interest Adjustment Period, Lender determines (which determination, in the absence of manifest error, shall be conclusive and binding) that:

(a) for any reason, Lender is unable, through its customary general practices, to obtain or determine the Index; or

(b) for any reason, it is impracticable, unlawful or impossible for Lender to utilize the Index for setting the interest rate from time to time in effect under this Note;

and Lender gives notice thereof to Borrower, then the obligation of Lender to accept or implement the Floating Interest Rate shall be automatically canceled and terminated with respect to any new Interest Adjustment Period and the principal balance of this Note from time to time outstanding shall bear interest at the Prime Equivalent Rate, unless and except to the extent that the Default Rate is applicable in accordance with the terms and provisions of this Note or to the extent described in Section 2.1(b).

2.6. Effect of Benchmark Transition Event.

(a) If Lender determines prior to the relevant Reference Time that a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the then-current Index, the Benchmark Replacement will replace the then-current Index for all purposes relating to this Note in respect of all determinations on such date and for all determinations on all subsequent dates.

(b) In connection with the implementation of a Benchmark Replacement, Lender will have the right to make Benchmark Replacement Conforming Changes from time to time. Notwithstanding anything to the contrary in this Note or in any other Loan Documents, any amendments to this Note or the other Loan Documents implementing such Benchmark Replacement Conforming Changes will become effective and binding on Borrower upon notice by Lender to Borrower without the necessity of any action by or consent of Borrower.

(c) Any determination, decision or election that may be made by Lender pursuant to this Section, including any determination with respect to administrative feasibility (whether due to technical, administrative or operational issues), a tenor, a rate, an adjustment or the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error, and, notwithstanding anything to the contrary in the documentation relating to this Note, will become effective without consent from any other party. Each such determination, decision and election will be in Lender's sole discretion.

2.7. <u>Additional Index Costs</u>. If any applicable law, treaty, rule or regulation (whether domestic or foreign) now or hereafter in effect, or any Regulatory Change therein, or any interpretation or change in interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof, or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority shall:

(a) subject Lender (or makes it apparent that it is subject) to any tax (including without limitation any U.S. interest equalization or other tax, however named), levy, impost, duty, charge, fee (collectively "**Taxes**"), or any deduction or withholding for any Taxes on or from any payment due from Borrower with respect to any portion of this Note, other than income and franchise taxes of the United States and its political subdivisions imposed on Lender;

(b) change the basis of taxation of payments due from Borrower to Lender under any portion of this Note (other than by a change in the rate of taxation of the overall net income of Lender or franchise taxes imposed on Lender);

(c) impose, modify, increase or deem applicable any reserve, special deposit requirement or similar requirement (including, but not limited to, state law requirements, Regulation D and Regulation K) imposed or deemed applicable by any Governmental Authority charged with the interpretation or administration of such requirements or deemed applicable against foreign assets held by or against loans made by Lender or against any other funds, obligations or other property owned or held by Lender;

(d) affect the amount of capital required or expected to be maintained by Lender or any corporation controlling Lender and Lender determines the amount of capital required is increased by or based upon the existence of this Note or its obligation to make the loans evidenced hereby; or

(e) impose on Lender any other condition regarding any portion of this Note;

and the result of any of the foregoing is to increase (by an amount deemed by Lender to be material) the cost to Lender of having the Floating Interest Rate applicable to any portion of this Note (or in the case of any capital adequacy or similar requirement, to have the

effect of reducing the rate of return on Lender's capital taking into account Lender's customary policies with respect to capital adequacy), or to reduce the amount of principal or interest or other sum received or receivable by Lender (by an amount deemed by Lender to be material), then upon five (5) days' written notice from Lender to Borrower, Borrower shall pay to Lender, from time to time as specified by Lender, such additional amount or amounts as will compensate Lender for such increased cost or reduced receipts or receivables.  Lender's determination of the amount of any such increase in cost or reduction in amounts received or receivable, in the absence of manifest error, shall be conclusive and binding.  Any certificate of Lender delivered to Borrower setting forth the determination of any additional amounts payable pursuant to this Section shall be conclusive and binding, absent manifest error, as to such determination and amount.  The obligations, agreements and covenants of Borrower contained in this Section shall survive the termination of this Note and the payment in full of all indebtedness evidenced by this Note.

3. <u>Payments</u>. Principal and interest shall be payable as follows:

3.1. <u>Interest Payments</u>.  Interest accruing from the effective date of this Note through and including the ninth (9th) day of the calendar month in which the effective date of this Note occurs, shall be payable in advance on the effective date of this Note; thereafter accrued and unpaid interest shall be payable commencing on the tenth (10th) day of the first calendar month following the effective date of this Note and continuing on the tenth (10th) day of each calendar month thereafter until this Note is paid in full.

3.2. <u>Payment on Maturity</u>.  On the Maturity Date, the entire unpaid principal balance and all accrued interest shall be due and payable.

4. <u>Prepayments</u>.

4.1. <u>Prepayments</u>.  Provided Borrower has paid in full (i) all accrued interest, fees and other amounts then due and payable to Lender pursuant to the Loan Documents, (ii) all principal, accrued interest, fees and other amounts then due and payable to Lender pursuant to the Facility B Loan Documents, (iii) the Exit Fee unless the Exit Fee is waived by Lender pursuant to the Fee Letter, and (iv) all breakage and other termination fees which might be payable by Borrower in connection with any Rate Management Transaction entered into by Borrower and Lender or any affiliate of Lender, Borrower shall have the privilege of prepaying any portion of the principal outstanding under this Note on any Business Day, after at least five (5) Business Days prior written notice to Lender, without the payment of a yield maintenance fee or prepayment penalty.

5. <u>Cost of Collection and Additional Default Rate Interest</u>.  In addition to all other sums payable under this Note, Borrower shall pay to Lender (a) attorneys' fees incurred by Lender in connection with (i) the protection of any security for or rights arising in connection with this Note or any of the Loan Documents, (ii) the enforcement of any provision contained in this Note or in any of the Loan Documents, (iii) the collection of any indebtedness evidenced hereby or arising in connection herewith, and (iv) any bankruptcy, reorganization, receivership or other proceeding affecting creditor's rights and involving a claim under this Note or any of the Loan Documents, (b) costs of collection, (c) interest at the Default Rate on all accrued interest which is

not paid when due, and (d) interest at the Default Rate on all fees, costs and expenses incurred by Lender which are to be reimbursed by Borrower pursuant to this Section, from the date demand for payment is made by Lender.  If, after the occurrence of an Event of Default hereunder, Lender employs an attorney or attorneys to protect Lender's rights or remedies arising in connection with this Note or under any of the Loan Documents, then Borrower shall pay to Lender upon demand all attorneys' fees and expenses incurred by Lender in connection with such Event of Default, regardless of whether any action is actually commenced against Borrower by reason of any such Event of Default.  Notwithstanding anything contained herein to the contrary, any provision contained herein requiring the reimbursement of attorney's fees incurred by Lender shall be deemed to be limited to reasonable attorneys' fees incurred by Lender.

      6.     <u>Valuation and Appraisement Laws</u>.  All principal, interest and other amounts payable under or with respect to this Note shall be payable without relief from valuation and appraisement laws.

      7.     <u>Late Charge</u>.  Borrower shall pay a "late charge" for the purpose of defraying expense incident to handling with respect to any monthly installment of interest and/or principal, or portion thereof, payable hereunder not paid within ten (10) days after the date when first due, at the rate of five cents (5¢) for each One and 00/100 Dollar ($1.00) so overdue, with a minimum charge of Twenty-Five and 00/100 Dollars ($25.00).  Borrower acknowledges and agrees that any expenses and damages that Lender might incur as a result of any payment not paid within ten (10) days after the date when first due will be extremely difficult and impractical to ascertain and agrees that the late charge imposed by this Section is a reasonable estimate of such expenses and damages and shall not be deemed to be a penalty.  Notwithstanding anything contained herein to the contrary, no "late charge" shall be payable with respect to the final payment due upon the maturity, or the early acceleration, of this Note.  Provided, however, nothing herein contained shall be construed as a waiver by Lender of its option to declare a default if any payment of any monthly installment of interest and/or principal, or portion thereof, is not made when due, and the assessment of a late charge shall not affect the right of Lender to increase the rate of interest as herein provided on all amounts not paid when due.

      8.     <u>Security</u>.  This Note is given to evidence indebtedness of Borrower to Lender arising in connection with the terms, provisions and conditions of the Loan Agreement.  This Note shall be entitled to the benefits of and is secured by (a) the Lease Assignment, (b) the Security Instrument, (c) any other security agreements or documents, as from time to time amended or modified, executed to Lender in connection with this Note or otherwise, and (d) any funds of Borrower on deposit with Lender.

      9.     <u>Application of Payments</u>.  Each payment hereunder shall be applied to the payment of accrued and unpaid interest, the principal balance outstanding under this Note and any other sums payable to Lender in connection with this Note or any documents entered into by Borrower in connection herewith, in such order and in such amounts as Lender shall determine in its sole discretion.  Such order may include, without limitation, the application first to any advance made by Lender under the terms of any instruments securing this Note which has not been repaid, then to any costs of collection or other costs or expenses for which Borrower is obligated to reimburse Lender pursuant to this Note or pursuant to any document executed in connection with this Note, then to any late charges due and owing under this Note, then to any accrued and unpaid interest,

and then to the principal balance outstanding. All amounts advanced by Lender (in addition to the principal advanced under this Note) pursuant to applicable provisions of the Security Instrument, the Loan Agreement or any other document entered into by Borrower in connection with this Note, together with interest at the Default Rate or other charges as provided therein, shall be added to and immediately due and payable under this Note. In the event any such advance is not so repaid by Borrower, Lender may, at its option, first apply any payments received hereunder to repay such advances together with any interest thereon or other charges, and the balance, if any, shall be applied toward the payment of interest and principal then due hereunder in such order as Lender shall determine, in its sole discretion.

10. <u>Timing and Method of Payments</u>. If the due date of any payment under this Note shall be a day that is not a Business Day, then the due date shall be extended to the next succeeding Business Day. All amounts payable from time to time under this Note, including without limitation principal and interest payments, shall be due and payable in immediately available funds on the date each such payment is due at the principal office of Lender before the time of day which Lender from time to time designates as its cut-off time for considering payments received as being received on such date (hereinafter referred to as the "**Cut-Off Time**"). In the event any payment is received by Lender after the Cut-Off Time on any day, such payment shall be deemed to be received as of the start of business on the next Business Day and, to the extent interest accrues on such amounts paid, interest shall continue to accrue until the next Business Day.

11. <u>Events of Default</u>. The occurrence of an "Event of Default" under the Loan Agreement shall constitute an event of default under this Note and each such occurrence is herein referred to as an "**Event of Default**". Accordingly, the provisions of the Loan Agreement are by reference incorporated herein and made a part hereof. For purposes of clarification, an "Event of Default" under the Loan Agreement shall mean the occurrence of any event or circumstance that would constitute an "Event of Default" as that term is defined in the Loan Agreement.

12. <u>Remedies</u>. Upon the occurrence and during the continuance of an Event of Default, all of the indebtedness evidenced by this Note and remaining unpaid, including without limitation the entire unpaid principal balance, any accrued and unpaid interest, all prepayment premiums payable hereunder, if any, and all other amounts payable under this Note, shall, at the option of Lender and without demand or notice, become immediately due and payable, anything contained in this Note to the contrary notwithstanding. Lender may exercise this option to accelerate regardless of any prior forbearance. Lender may, in its sole discretion without further notice or demand to Borrower, pursue any one or more of the rights, powers and remedies available to Lender under this Note or any of the Loan Documents, concurrently or successively, it being the intent hereof that none of such rights, powers and remedies shall be to the exclusion of any other. Lender, at its option, shall have the right to perform all acts necessary for the performance, sale, collection and enforcement of any collateral securing this Note and/or any other agreement or document executed in connection herewith. Enforcement by Lender of any security for Borrower's obligations under this Note, or enforcement by Lender of any guaranty of the indebtedness and obligations arising under this Note, shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender. In addition to all other remedies available to Lender after the occurrence and during the continuance of an Event of Default hereunder, Lender may, without demand or notice of any kind, apply any funds of Borrower on deposit with or in the possession of Lender toward the payment of any

indebtedness outstanding under this Note, in such manner of application as Lender may choose. All rights and remedies of Lender herein specified are cumulative and in addition to, not in limitation of, any other rights and remedies which Lender may have by law or at equity.

        13.       <u>Waiver and Consent</u>.  Presentment, notice of intent to accelerate, notice of acceleration, notice of dishonor and demand, valuation and appraisement, protest and diligence in collection and bringing suit are hereby severally waived by Borrower and each endorser or guarantor, each of whom further consents that the time for the payment of this Note, or of any installment hereunder, may be extended from time to time without notice by Lender.  All guarantors, sureties and accommodation parties of this Note hereby waive generally and specifically, to the extent waivable, any and all rights that they may have, by contract, at equity or under any state or federal law, to any defense, offset, claim in recoupment or counterclaim not specifically set forth herein.

        14.       <u>No Waiver</u>.  No waiver of any default or failure or delay to exercise any right or remedy by Lender shall operate as a waiver of any other default or of the same default in the future or as a waiver of any right or remedy with respect to the same or any other occurrence.  The acceptance by Lender of any payment after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments or to exercise any right or remedy with respect to any failure to make prompt payment.

        15.       <u>Usury Laws</u>.  It is the intention of the parties hereto to comply strictly with all applicable usury laws.  All agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of the maturity hereof, or otherwise, shall the amount paid, or agreed to be paid to Lender for the use, forbearance, or detention of the money to be loaned hereunder or otherwise or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing, or pertaining to the indebtedness evidenced hereby, exceed the maximum amount permissible under applicable law.  If from any circumstance whatsoever fulfillment of any provision hereof or of such other documents, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law, then *ipso facto*, the obligation to be fulfilled shall be reduced to the limit of such validity, and if from any such circumstance Lender shall ever receive as interest or otherwise an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal indebtedness of Borrower to Lender, and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of principal hereof, such excess shall be refunded to Borrower.  All sums paid or agreed to be paid by Borrower for the use, forbearance or detention of the indebtedness of Borrower to Lender hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of such indebtedness until payment in full in such manner that there will be no violation of applicable laws pertaining to the maximum rate or amount of interest which may be contracted for, charged or received with respect to such indebtedness.  Borrower shall not institute any action or file any defense based upon the charging or collecting of usurious interest hereunder unless (i) Borrower shall give Lender written notice of an intent to do so and (ii) Lender shall fail to comply with the terms hereof by making necessary adjustments as required by this Section, and notify Borrower of such compliance within fifteen (15) days after receipt by

Lender of such written notice from Borrower. The provisions of this Section shall be given precedence over any other provision contained herein or in any other agreement between the parties hereto that is in conflict with the provisions of this Section.

16. <u>Waiver of Trial by Jury</u>. Borrower hereby agrees that any suit, action or proceeding, whether a claim or counterclaim, brought or instituted by any party on or with respect to this Note or any other document executed in connection herewith or which in any way relates, directly or indirectly to the Loan Agreement or any event, transaction or occurrence arising out of or in any way connected with this Note or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury. BORROWER, AND LENDER BY ACCEPTANCE OF THIS NOTE, HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING. Borrower acknowledges that Borrower may have a right to a trial by jury in any such suit, action or proceeding and that Borrower hereby is knowingly, intentionally and voluntarily waiving any such right. Borrower further acknowledges and agrees that this Section is material to this Note and that adequate consideration has been given by Lender and received by Borrower in exchange for the waiver made by Borrower pursuant to this Section.

17. <u>Waiver of Special Damages</u>. Borrower waives, to the extent waivable, any right Borrower may have to claim or recover from Lender any special, exemplary, punitive or consequential damages in any legal action or proceeding related in any way to this Note or any of the Loan Documents.

18. <u>Notices</u>. Any written notice required or permitted to be given to Lender or to Borrower hereunder shall be deemed effective when given in the manner as provided for in the Loan Agreement for the sending of notices to Lender and to Borrower.

19. <u>Legal Tender</u>. This Note is negotiable and is payable in lawful money of the United States of America which shall be legal tender in payment of all debts and dues, public and private, at the time of payment.

20. <u>Right of Setoff</u>. To the extent permitted by applicable law, Lender reserves a right of setoff in all of Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this Section.

21. <u>Successors and Assigns</u>. The obligations of Borrower hereunder shall be binding upon Borrower and Borrower's successors, assigns and legal representatives (the reference to "Borrower" in this Note shall be deemed to include, without limitation, such successors, assigns and legal representatives) and shall inure to the benefit of Lender and Lender's successors, assigns and legal representatives (the reference to "Lender" in this Note shall be deemed to include, without limitation, such successors, assigns and legal representatives, including, without limitation, any subsequent holder of this Note); provided however, that the Loan Documents cannot be assigned by Borrower without the prior written consent of Lender, and any such

assignment or attempted assignment by Borrower shall be void and of no effect with respect to Lender.

22.  <u>Governing Law</u>.  This Note is delivered to Lender in the State of Indiana and is executed under and shall be governed by and construed in accordance with the laws of the State of Indiana, notwithstanding that Indiana conflicts of law rules might otherwise require the substantive rules of law of another jurisdiction to apply.

23.  <u>Time of the Essence</u>.  Time is of the essence with respect to each obligation and agreement of Borrower under this Note.

24.  <u>Invalidity of Any Provision</u>.  If any provision (or portion thereof) of this Note or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, then the remainder of this Note or the application of such provision (or portion thereof) to any other person or circumstance shall be valid and enforceable to the fullest extent permitted by law.

25.  <u>Continuing Enforcement</u>.  If, after receipt of any payment of all or any part of this Note, Lender is compelled or agrees, for settlement purposes, to surrender such payment to any person or entity for any reason (including, without limitation, a determination that such payment is void or voidable as a preference or fraudulent conveyance, an impermissible setoff, or a diversion of trust funds), then this Note and the other Loan Documents shall continue in full force and effect or be reinstated, as the case may be, and Borrower shall be liable for, and shall indemnify, defend and hold harmless Lender with respect to, the full amount so surrendered.  The provisions of this Section shall survive the cancellation or termination of this Note and shall remain effective notwithstanding the payment of the obligations evidenced hereby, the release of any security interest, lien or encumbrance securing this Note or any other action which Lender may have taken in reliance upon its receipt of such payment.  Any cancellation, release or other such action shall be deemed to have been conditioned upon any payment of the obligations evidenced hereby having become final and irrevocable.

26.  <u>Captions and Interpretation</u>.  The captions or headings herein have been inserted solely for the convenience of reference and in no way define or limit the scope, intent or substance of any provision of this Note.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  This Note shall be construed without regard to any presumption or other rule requiring construction against the party or parties causing this Note to be drafted.

[the remainder of this page is intentionally left blank,
see following page for signature of Borrower]

**SIGNATURE PAGE FOR PROMISSORY NOTE (FACILITY A)**

IN WITNESS WHEREOF, Borrower has caused this Note to be executed effective as of the day and the year first above written.

        PAEX LANDMARK SQUARE PA LP,
        a Pennsylvania limited partnership

        By:  PAEX Landmark Apartment LLC,
              a Delaware limited liability company,
              its General Partner

        By: _____
              Aron Puretz, Member

STATE OF __NJ__ )
                     ) SS:
COUNTY OF __Oce__ )

Before me, a Notary Public in and for said County and State, personally appeared Aron Puretz, the Member of PAEX Landmark Apartment LLC, a Delaware limited liability company, which is the General Partner of PAEX Landmark Square PA LP, a Pennsylvania limited partnership, who, after having been duly sworn, acknowledged the execution of the foregoing Promissory Note (Facility A) for and on behalf of such limited partnership.

WITNESS my hand and Notarial Seal this __31__ day of __August__, 2022.

_____
(                        ) Notary Public

My Commission Expires:        My County of Residence:

_____    _____

[Notary Seal: SHOSHANA JOSEPH, NOTARY PUBLIC, STATE OF NEW JERSEY, MY COMMISSION EXPIRES NOVEMBER 10, 2024]