# EXHIBIT 3

## LOAN AGREEMENT
### (Facility A)

THIS LOAN AGREEMENT (Facility A) is made and entered into effective as of the 2nd day of September 2022, by and between PAEX LANDMARK SQUARE PA LP, a Pennsylvania limited partnership (hereinafter referred to as "**Borrower**"), and MERCHANTS BANK OF INDIANA (hereinafter referred to as "**Lender**").

## PRELIMINARY RECITALS

A.      Borrower holds title in fee simple absolute to certain real estate located in Erie County, Pennsylvania, more particularly described in Exhibit "A" attached hereto and by reference made a part of this Agreement (hereinafter referred to as the "**Real Estate**").

B.      Borrower has applied to Lender for a loan in the principal amount of Ten Million Seven Hundred Thirty-Six Thousand and 00/100 Dollars ($10,736,000.00) to finance, among other things as hereinafter described, the acquisition of the Real Estate and the rehabilitation of the Improvements (as defined below) thereon and Lender is willing to make such loan to Borrower subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of Lender extending to Borrower the credit arrangements provided for herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower and Lender hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATIONS

Section 1.1.    Definitions.  In addition to the words and phrases defined elsewhere in this Agreement, the following terms shall have the meaning indicated when capitalized and used herein:

"**Affiliate**" shall mean any Person who, directly or indirectly through one or more intermediaries, is in control of, is controlled by, or is under common control with, another Person.  For purposes of this definition, a Person shall be deemed to be "controlled by" another Person if another Person or a director, officer, shareholder or employee of another Person possesses, directly or indirectly, power to (i) vote 10% or more of the securities having ordinary voting power for the election of directors of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the legal representative, successor or assign of any such Person.  In addition, if such Person is an individual, any member of the immediate family (including parents, spouse, children and siblings) of such individual and any trust whose principal beneficiary is such individual or one or more members of such immediate family shall be deemed to be an Affiliate of such Person.

"**Agreement**" shall mean this Loan Agreement (Facility A) as from time to time amended or modified.

"**Appraised Value**" shall mean the market value of the Real Estate and Improvements arrived at under any appraisal from time to time furnished to Lender pursuant to the terms of this Agreement, which is in form and substance and prepared by an appraiser acceptable to Lender.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended, modified or replaced.

"**Beneficial Owner**" and "**Beneficial Owners**" shall mean, individually and collectively, each member, shareholder, or partner of Borrower and any other person or entity who owns or holds a direct or indirect legal or beneficial interest in Borrower.

"**Business Day**" shall mean any day of the week (but not a Saturday, Sunday or holiday) on which the offices of Lender are open to the public for carrying on substantially all of Lender's business functions. Unless specifically referenced in this Agreement as a Business Day, all references to "days" shall be to calendar days.

"**Code**" shall mean the Uniform Commercial Code as adopted and in effect from time to time in any jurisdiction whose laws may be applicable with respect to the security interest granted under the Loan Documents. Any reference in this Agreement to a specific Article or section of the Code that has been repealed shall be deemed to mean a reference to any Article that may from time to time be enacted and in effect as a replacement for such repealed Article or section of the Code.

"**Control**" (including with correlative meanings, such as "Controlling," "Controlled by" and "under common Control with") means, as applied to any entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management and operations of such entity, whether through the ownership of voting securities or other ownership interests, by contract or otherwise.

"**Critical Repair List**" shall mean those repairs disclosed on Exhibit "B" attached hereto.

"**Debt Service - Distribution**" shall mean, for a specified period, the sum of all interest and principal payments due and payable by Borrower under the Loan, calculated by amortizing the principal outstanding under the Loan and the Facility B Loan as of the date of calculation at the Floating Rate (as such term is defined in the Note) over a period of thirty (30) years.

"**Debt Service Coverage Ratio - Distribution**" shall mean, for a specified period, the ratio of (a) Net Income plus interest expense, depreciation and amortization minus Replacement Reserve Amount to (b) Debt Service - Distribution, all as determined by Lender in its reasonable discretion. Lender's determination of Debt Service Coverage Ratio - Distribution shall be based upon the financial statements for Borrower provided to Lender pursuant to this Agreement.

"**Environmental Law(s)**" shall mean any present and future federal, state or local statute, law (including common law), ordinance, code, rule, regulation, guideline, order or decree regulating, relating to, or imposing liability or standards of conduct concerning (i) any Hazardous Substance, (ii) the protection of human health or the environment or (iii) any Wetlands, each as now or at any time hereafter in effect. The term "Environmental Law" includes, but is not limited to, the following statutes, as amended from time to time, any

successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations, guidelines and the like addressing similar issues: (i) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, et seq. and the regulations promulgated thereunder, (ii) the Clean Air Act, 42 U.S.C. 7401, et seq. and the regulations promulgated thereunder, (iii) the Clean Water Act, 33 U.S.C. 1251, et seq. and regulations promulgated thereunder, (iv) the Resource, Conservation and Recovery Act, 42 U.S.C. 6901, et seq. and regulations promulgated thereunder, (v) the Oil Pollution Act of 1990, 33 U.S.C. 2701, et seq. and regulations promulgated thereunder, and (vi) the Hazardous Materials Transportation Act, 49 U.S.C. 1801, et seq. and regulations promulgated thereunder.

"**Event of Default**" shall have the meaning as defined in Section 12.1 of this Agreement.

"**Facility B Loan**" shall mean the loan to be made by Lender to Borrower pursuant to the terms of the Facility B Loan Agreement in a principal amount equal to One Million Seven Hundred Sixty-Four Thousand and 00/100 Dollars ($1,764,000.00), as such loan may be from time to time amended or modified.

"**Facility B Loan Agreement**" shall mean that Loan Agreement (Facility B) executed or to be executed by and between Borrower and Lender in connection with the Facility B Loan, as from time to time may be amended, modified, replaced or restated.

"**Facility B Loan Documents**" shall mean the Facility B Loan Agreement and all other documents evidencing, securing or entered into in connection with the Facility B Loan as such documents and agreements may be modified or amended from time to time and/or any documents and agreements which replace or restate such documents and agreements.

"**Fee Letter**" shall mean that certain fee letter dated as of even date herewith issued by Lender and acknowledged by Borrower.

"**GAAP**" means generally accepted accounting principles in effect from time to time in the United States of America.

"**Governmental Authority**" means, with respect to any Person, any nation or government, any state or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any body or entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any court or arbitrator having jurisdiction over such Person.

"**Guarantor**" and "**Guarantors**" shall mean individually and collectively Aron Puretz, and any other party which may at any time become a guarantor of the Loan.

"**Guaranty**" and "**Guaranties**" shall mean individually and collectively each certain Continuing Guaranty (Facility A) executed or to be executed by a Guarantor in connection with this Agreement, as such guaranties may be modified or amended from time to time and/or any guaranty or guaranties which replace or restate such continuing guaranty or guaranties.

"**Hazardous Substance(s)**" shall mean any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as "pollutants," "hazardous wastes," "hazardous

substances," "hazardous materials," "extremely hazardous wastes," "toxic substances," "oil," "waste oil," and "used oil" or words of similar meaning or regulatory effect under any present or future Environmental Law or that may have a negative impact on human health, property value or the environment, including but not limited to Mold, petroleum and petroleum products, asbestos and asbestos containing materials, polychlorinated biphenyls, lead, lead based paints, radon, radioactive materials, flammables and explosives.

"**Improvements**" shall mean the improvements on the Real Estate, including the Project, together with (i) any paved driveways and parking facilities and sidewalks located on the Real Estate, (ii) any mechanical, electrical, plumbing, heating, ventilating, air conditioning and life safety equipment and systems; appliances, elevators and escalators and other similar systems and items of equipment installed in or upon, and affixed to such improvements, whether or not the same may be movable and whether or not removal thereof would cause damage to such improvements, (iii) all landscaping, signage, utilities, curbs and gutters, and (iv) all tenant improvements incorporated into the Project pursuant to the terms of any current or future leases for all or any portion of the Project.

"**Indebtedness**" shall mean all obligations and liabilities of Borrower to pay money to any Person (including without limitation all debts and indebtedness) whether primary, secondary, direct, contingent, fixed or payable, heretofore, now and/or from time to time hereafter owing, due or payable, however evidenced, created, incurred, acquired or owing and however arising, whether under written or oral agreement, operation of law, or otherwise. Indebtedness includes, without limiting the generality of the foregoing, (i) obligations or liabilities of any Person secured by any lien, claim, encumbrance, or security interest upon property owned by Borrower even though Borrower has not assumed or become liable for the payment therefore; and (ii) obligations or liabilities created or arising under any lease of real or personal property or conditional sale or other title retention agreement with respect to property used and/or acquired by Borrower, even though the rights and remedies of the lessor, seller and/or lender thereunder are limited to repossession of such property.

"**Indemnity Agreement**" shall mean that certain Environmental Certificate and Indemnity Agreement (Facility A) of even date herewith, executed or to be executed by Borrower and Guarantor(s) in favor of Lender in connection with this Agreement, covering the Project, as from time to time amended, modified, replaced or restated.

"**Lease Assignment**" shall mean that certain Assignment of Leases and Rents (Facility A) of even date herewith, executed or to be executed by Borrower to Lender in connection with this Agreement, covering the Project, as from time to time amended, modified, replaced or restated.

"**Loan**" shall mean the loan to be made by Lender to Borrower pursuant to the terms of this Agreement in a principal amount equal to Ten Million Seven Hundred Thirty-Six Thousand and 00/100 Dollars ($10,736,000.00), as such loan may be from time to time amended or modified.

"**Loan Document**" and "**Loan Documents**" shall mean individually and collectively, this Agreement, the Note, the Security Instrument, the Lease Assignment, the Indemnity Agreement,

the Guaranties, the Management Agreement Assignment and all other documents evidencing, securing or entered into in connection with the Loan as such documents and agreements may be modified or amended from time to time and/or any documents and agreements which replace or restate such documents and agreements.  Loan Documents shall also include, if applicable, any instrument, agreement or document executed in connection with any Rate Management Transaction now or hereafter entered into by Borrower.  The Loan Documents and the terms and conditions thereof are hereby incorporated by reference and made a part of this Agreement.

"**Manager**" shall mean ALOFT MGT LLC, a New York limited liability company , together with its successors and assigns, and any other entity engaged by Borrower to provide property management services to the Project as permitted hereunder.

"**Management Agreement**" shall mean the Management Agreement entered into by and between Borrower and Manager, pursuant to which the Manager is to provide management, support and other services with respect to the Project.

"**Management Agreement Assignment**" shall mean that certain Assignment and Subordination of Management Agreement (Facility A) of even date herewith, executed or to be executed by Borrower and Manager to Lender in connection with this Agreement, as from time to time amended, modified, replaced or restated.

"**Mold**" shall mean mold or any fungus, bacteria, spores or other airborne microbial contaminants of a type that could pose a risk of any kind to human health or the indoor or outdoor environment or could negatively impact the value of the Project.

"**Net Income**" shall mean, for any period, gross revenues (excluding extraordinary income) less all operating expenses (including without implied limitation any monthly management fees), determined in accordance with GAAP.  In determining Net Income, real estate taxes, insurance premiums and any other expenses which are incurred or are payable less frequently than on a monthly basis shall be annualized and treated as expenses incurred in equal monthly amounts based upon the amount of the most recent bills and invoices for such items (regardless of whether the same shall have been paid or have become due and payable during such period).  In addition, only leases entered into with third party tenants not affiliated with Borrower or Guarantors shall be included in calculating the gross income generated from leases for the Project.

"**Note**" shall mean that certain Promissory Note (Facility A) of even date herewith evidencing the Loan, executed by Borrower and payable to the order of Lender in the principal amount of Ten Million Seven Hundred Thirty-Six Thousand and 00/100 Dollars ($10,736,000.00) as such promissory note may be modified or amended from time to time and/or any promissory note which is a direct or remote renewal, extension, restatement or replacement of such promissory note.

"**OFAC**" means the U.S. Department of the Treasury's Office of Foreign Assets Control, and any successor thereto.

"**PATRIOT Act**" means the USA PATRIOT Act [Title III of Pub. L. 107-56 (signed into law October 26, 2001)], as amended from time to time, and any successor statute.

"**Organizational Documents**" shall mean all documents pursuant to which a Person was created or organized and all documents which govern the ownership and control of a Person, as such documents may be from time to time amended or modified.

"**O&M Plans**" shall mean (i) a certain ACM operations and maintenance plan, and (ii) a certain lead-based paint operations and maintenance plan.

"**Person**" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, entity, party or government (whether national, federal, state, county, city, municipal or otherwise, including without limitation, any instrumentality, division, agency, body or department thereof).

"**Personal Property**" shall mean all personal property, appliances, equipment, furniture, fixtures, fittings, furnishings and landscaping now or hereafter attached to, located at, or placed in the Improvements or on the Real Estate which will be owned or leased by Borrower or in which Borrower will otherwise acquire an interest. Personal Property shall exclude the trade fixtures, inventory, equipment or removable property of any tenant of the Project.

"**Prohibited Transfer**" shall mean an occurrence of any of the following events without the prior written approval of Lender being first obtained, whether such event is voluntary, involuntary or by operation of law: (a) Borrower sells, conveys, transfers, assigns, changes the form of ownership, or disposes of the Project, or any part thereof, or any interest therein (including without limitation any right to collect any income therefrom), or agrees so to do; (b) Borrower (or any member, partner, shareholder or other stakeholder) further mortgages, encumbers, collaterally assigns, pledges or grants a security interests in any portion of the direct or beneficial interest of Borrower in the Project, or any part thereof, or any interest therein (including without limitation any right to collect any income therefrom), or agrees so to do; or (c) any stock, partnership, membership or beneficial interest of Borrower, or of any direct or indirect member, partner, shareholder or stakeholder of Borrower, is sold, conveyed, transferred, collaterally assigned, pledged or encumbered (or a security interest is granted therein), or there is an agreement so to do. The consent by Lender to any one transaction that would otherwise be a Prohibited Transfer shall not be deemed to be a waiver of the right to require consent to future or successive transactions. If the Project or the corporate, partnership, membership or beneficial interest in Borrower, or any part thereof, should be transferred to any other Person with the consent of Lender, thereafter a subsequent transfer of such interest, shall constitute a Prohibited Transfer and the consent of the Lender shall be required. Notwithstanding the foregoing or anything contained herein or in the Loan Documents to the contrary, the following events (each such permitted event is herein referred to as a "Limited Permitted Transfer") shall not be deemed to be Prohibited Transfers and shall not require the consent of the Lender: (A) a transfer of a direct or indirect ownership interest in Borrower resulting from the death of any Person that owns a direct or indirect interest of Borrower, (B) a transfer of a direct or indirect ownership interest in Borrower resulting from a transfer from a Person that owns a direct or indirect interest of Borrower to a trust or immediate family member for estate planning transfer, provided that, (i) any such transfers in the aggregate are in an amount less than fifty percent (50%) of the direct or indirect ownership interests in Borrower, and (ii) any such transfers do not result in a change in Control. An amendment to the operating agreement for Borrower to effectuate a Limited

6

Permitted Transfer shall not require the consent of Lender and shall not constitute a Prohibited Transfer. Furthermore, an agreement to sell the Project, further mortgage the Project or transfer an interest in the Borrower or the Project that would cause a Prohibited Transfer upon such sale, mortgage or transfer shall not be deemed to be a Prohibited Transfer so long as the consummation of such agreement would result in the payment of the indebtedness evidenced by the Note in full at the time of such sale, mortgage or transfer.

"**Project**" shall mean collectively the Real Estate, Improvements and Personal Property.

"**Rate Management Transaction**" shall mean any transaction (including any agreement with respect thereto) now existing or hereafter entered into between Borrower and Lender, or any of Lender's subsidiaries or Affiliates or their successors, which is an interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement, or other interest or currency exchange rate or commodity price hedging arrangement, including without limitation (i) any rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar hedging arrangement or transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures, (ii) any transaction which is governed or evidenced by an ISDA Master Agreement and any related schedule, confirmation or document confirming or evidencing the transaction or trade details and (iii) any existing or future swap agreement as defined in 11 U.S.C. § 101, et seq. and the regulations promulgated thereunder, as in effect from time to time.

"**Real Estate**" shall have the meaning as defined in the Preliminary Recitals of this Agreement.

"**Replacement Reserve Agreement**" shall mean that certain Replacement Reserve Agreement (Facility A) of even date herewith, executed or to be executed by Borrower to Lender in connection with this Agreement, pursuant to which Borrower shall establish and maintain with Lender the Replacement Reserve Fund, as from time to time amended, modified, replaced or restated.

"**Replacement Reserve Amount**" shall mean, for a specified period, an amount necessary, when added to the Replacement Reserve Fund attributable to any other period, to create and maintain a reserve fund sufficient to pay in full any necessary or desirable deferred maintenance for the Project. The amount established for Replacement Reserve for any period shall be determined pursuant to the Replacement Reserve Agreement.

"**Replacement Reserve Fund**" shall mean the replacement reserve established by Borrower pursuant to the terms and provisions of the Replacement Reserve Agreement.

"**Restricted Distribution**" shall mean any of the following: (i) any direct or indirect distribution of cash or other assets to any Beneficial Owner, including distributions made for the purpose of paying income or other taxes owed by the Beneficial Owners of Borrower, (ii) any

repayment of all or any portion of a loan to a Beneficial Owner or to any Affiliate of a Beneficial Owner, (iii) any return of capital contributions to a Beneficial Owner, (iv) any distribution to a Beneficial Owner upon the termination, liquidation or dissolution of Borrower, or (v) the payment of any development, construction, property management, accounting or other fee to a Beneficial Owner or to any Affiliate of a Beneficial Owner except to the extent such fee is reasonable in comparison to the cost of similar services from an independent third party and is expressly approved by Lender, such approval not to be unreasonably withheld, conditioned or delayed.

"**Security Instrument**" shall mean that certain Mortgage, Assignment of Leases and Rents, Security Agreement, Financing Statement, and Fixture Filing (Facility A) of even date herewith, executed or to be executed by Borrower to Lender in connection with this Agreement, covering the Project, as from time to time amended, modified, replaced or restated.

"**SPE Requirements**" shall mean that the Borrower (i) is formed or organized solely for the purpose of acquiring, developing, operating and owning a real property interest in the Project and the activities incidental thereto, (ii) does not engage in any business unrelated to the Project, (iii) does not have any assets other than those related to its interest in the Project and the cash revenue generated therefrom, (iv) does not have any indebtedness (including contingent liabilities) other than the Loan and any indebtedness which is otherwise expressly permitted under the terms of the Loan Documents, (v) maintains its books and records, accounts separate and apart from the books, records and accounts of any other entity, and (vi) holds itself out as being an entity separate and apart from any other entity.

"**Title Insurance Company**" shall have the meaning as defined in Section 4.1(e) of this Agreement; such title insurance company to be a title insurance company acceptable to Lender.

"**Title Insurance Policy**" shall have the meaning as defined in Section 4.1(e) of this Agreement.

"**Wetland(s)**" shall have the meaning ascribed in 33 C.F.R. §328.3, as hereinafter amended, or defined by any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning any such Wetlands, as now or at any time hereafter in effect.

Section 1.2.    Accounting Terms and Determinations.  All accounting calculations and reports shall be prepared, and all accounting terms shall be construed, in accordance with GAAP for financial accounting purposes, as in effect from time to time, unless otherwise hereinafter specified.

Section 1.3.    Uniform Commercial Code Terms.  To the fullest extent reasonably possible, all terms defined herein shall be construed to be complementary with any of the meanings set forth and ascribed to such terms in the Code as from time to time adopted in the State(s) in which the Project is located and, if different, in which Borrower is organized. However, if such defined terms cannot be construed as complementary, then the terms of this Agreement shall govern.

Section 1.4. <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time modified, amended or restated (subject to any restrictions on such modifications set forth herein), (b) any reference herein to any person or entity shall be construed to include such person's or entities successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Paragraphs, Articles, Sections, Exhibits and Exhibits shall be construed to refer to Paragraphs, Articles and Sections of, and Exhibits and Exhibits to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (f) whenever this Agreement provides that any consent or approval will not be "unreasonably withheld" or words of like import, the same shall be deemed to include within its meaning that such consent or approval will not be unreasonably delayed.

Section 1.5. <u>Recitals</u>. The above and foregoing Recitals are true and correct and incorporated herein and form a part of this Agreement.

**ARTICLE II**
**LOAN**

Section 2.1. <u>Loan</u>. Subject to the terms and conditions of this Agreement and the compliance by Borrower with its obligations to Lender hereunder, Lender shall advance to Borrower and Borrower shall borrow from Lender the Loan. The Loan shall bear interest on amounts advanced as provided for under the Note. The Loan shall be evidenced by and payable in the manner specified in the Note.

**ARTICLE III**
**COLLATERAL AND GUARANTEES**

Section 3.1. <u>Collateral</u>. The indebtedness and obligations of Borrower to Lender under this Agreement, the Loan, any Rate Management Transaction, and any other agreement, instrument or document executed in connection herewith shall be secured by: (a) a first mortgage or deed of trust lien covering the Project, a first assignment of all rents and leases and a first security interest in all Personal Property and all inventory, equipment, fixtures, furnishings, contract rights, accounts, accounts receivable, instruments, documents, securities, chattel paper, trademarks, licenses, permits, letter of credit rights, supporting obligations and general intangibles owned by Borrower and located on the Real Estate, incorporated in the Improvements or used in connection with the operation of the Project, all granted under the terms of the Security Instrument, (b) a first assignment of all leases now or hereafter entered into which demise any portion of the Project, together with any guaranties of the tenant's obligations

9

thereunder and together with the right to collect and receive all rents, incomes, payments and profits arising out of such leases or out of the Project or any part thereof, all granted under the terms of the Lease Assignment, (c) any funds of Borrower on deposit with Lender and (d) any other security agreements or documents from time to time executed to Lender in connection with this Agreement or the Loan.

Section 3.2.    <u>Limited Guaranty</u>.  Each Guarantor shall execute and deliver to Lender a Guaranty pursuant to which each Guarantor shall unconditionally guarantee non-recourse carve-outs pursuant to the terms and provisions of the Guaranty.

Section 3.3.    <u>Environmental Indemnities</u>.  Borrower and Guarantor(s) shall certify to and indemnify Lender as to certain environmental matters pursuant to the Indemnity Agreement executed or to be executed by Borrower and Guarantor(s) in favor of Lender.

**ARTICLE IV**
**CONDITIONS PRECEDENT TO THE ADVANCEMENT OF THE LOAN**

Section 4.1.    <u>Conditions Precedent to the Advancement of the Loan</u>.  Each of the following conditions shall be a condition precedent to the initial advancement of the Loan by Lender pursuant to this Agreement, provided, however, that any condition not satisfied or expressly waived by Lender at the time of the advancement of the Loan shall not be deemed waived but shall be satisfied as Lender may later require:

(a)    Borrower has executed and delivered to Lender the Note, the Security Instrument, the Lease Assignment, the Indemnity Agreement and any other Loan Documents which Lender may require that Borrower execute.

(b)    Borrower has caused the Guaranties and the Indemnity Agreement, and any other Loan Documents which Lender may require that any Guarantor or any other third party execute in connection with the Loan, to be executed and delivered to Lender.

(c)    Borrower is in full compliance with all terms and conditions of this Agreement and the other Loan Documents and all warranties and representations made hereunder remain true and correct in all material respects.

(d)    Borrower has paid all fees, costs and expenses which Borrower is required to pay pursuant to Article VII of this Agreement and the Fee Letter.

(e)    Borrower has furnished to Lender a commitment for a lender's policy of title insurance in an amount equal to the Loan issued by a title insurance company acceptable to Lender (herein referred to as the "**Title Insurance Company**"), insuring to Lender the first lien of the Security Instrument on the Real Estate and the Improvements together with any easements for parking and ingress and egress which benefit the Real Estate, free and clear of all liens, claims, encumbrances, easements, encroachments and defects, except for the lien of current real estate taxes not delinquent and other restrictions of record acceptable to Lender.  The Title Insurance Company shall provide affirmative mechanic's lien coverage for advancements made during renovation of the Project.  Such commitment shall contain such special coverage endorsements as Lender

may reasonably require. Upon request by Lender, Borrower shall deliver to Lender satisfactory evidence from the Title Insurance Company acknowledging payment in full for all premiums, costs and expenses for issuance of such binder and the final policy of insurance to be issued pursuant thereto and obligating the Title Insurance Company to (i) issue a continued commitment after recordation of the Security Instrument which shows the Security Instrument as a first lien upon the Real Estate subject to the above conditions, and (ii) issue, upon demand by Lender, a final extended coverage lender's policy of title insurance on the ALTA 2006 Loan Policy form with only exceptions satisfactory to Lender which insures the first lien of the Security Instrument (the final policy required pursuant to the terms of this Agreement is herein referred to as the **"Title Insurance Policy"**). If the title commitment and Title Insurance Policy is being issued by an agent of the Title Insurance Company instead of directly by the Title Insurance Company, Borrower shall cause the Title Insurance Company to issue in favor of Lender an insured closing letter setting forth the agent's authority to bind the Title Insurance Company to the title insurance coverage and protections required by this Agreement.

(f)     Borrower has furnished to Lender a survey of the Real Estate and insured easements prepared in accordance with the American Land Title Association's and the National Society of Professional Surveyors, Inc.'s minimum standards for surveys, showing by stakes or foundation lines the location of the Improvements thereon prepared and certified to Lender by a registered land surveyor acceptable to Lender and containing a certification in respect to the legal description, compliance with applicable zoning ordinances and that the Real Estate is not in an area designated as a Wetland. The survey should be performed in accordance with the 2021 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys, jointly established and adopted by ALTA and NSPS, and shall include Items 1, 2, 3, 4, 6(a), 6(b), 7(a), 7(b)(1), 7(c), 8, 9, 10, 11(a), 13, 16, 17 and 18 of Table A thereof. In addition, such survey must show the location of all improvements, driveways and parking facilities (including the total number of parking spaces), front, rear and side building setback lines, utility lines, easements, rights-of-way, encroachments, overlaps, flood plains, all courses and distances referred to in the legal description, the names and widths of streets, the total acreage or square footage area of the Real Estate, the height and total square footage of all structures, all other survey matters affecting the Real Estate and insured easements covered by the title commitment and such other information as Lender may require. A minimum standard detail requirement certification shall be set forth on the survey or on a certificate attached to the survey and certified to Lender and the Title Insurance Company.

(g)     Borrower has furnished to Lender evidence of hazard insurance coverage for the Project on an "All Risk" or "Special Causes of Loss" coverage form, all in such amounts and in form and with insurers reasonably acceptable to Lender. Such insurance shall be in amounts equal to the full replacement costs of the Improvements plus Borrower's interest in any leasehold improvements and shall include such special coverages as Lender may reasonably require, including without limitation coverage for earthquakes. All policies shall include a standard mortgagee endorsement and lender's loss payee endorsement in favor of Lender.

(h)     Borrower has furnished to Lender evidence of comprehensive general liability insurance with Lender named as an additional insured, in such amounts and in form and with insurers reasonably acceptable to Lender.

(i)     Borrower has furnished to Lender evidence of worker's compensation and other insurance required by the laws of the State in which the Project is located, or any other applicable jurisdiction, with Lender named as a certificate holder, such insurance to be with companies and in amounts reasonably acceptable to Lender.

(j)     Lender shall have completed its internal flood hazard review process and shall have (A) satisfied all regulatory and internally mandated requirements, policies and procedures with respect to flood-related matters, as Lender shall determine in its sole discretion, and (B) received evidence that the Real Estate is not located in a flood hazard area as defined under the Flood Disaster Protection Act of 1973 and the National Flood Insurance Act of 1968 or Borrower has obtained and furnished to Lender evidence of flood insurance coverage, with a standard mortgagee endorsement in favor of Lender, such insurance to be with a company and in an amount and with coverages as required by the terms of this Agreement.

(k)     Borrower has furnished to Lender a certificate authorizing the making of the Loan to Borrower and the execution and delivery by Borrower of all documents and instruments in connection therewith.

(l)     Borrower has furnished to Lender copies of the Organizational Documents of Borrower.

(m)     Borrower has furnished to Lender an original, current Certificate of Good Standing or its equivalent for Borrower issued by the Office of the Secretary of State of Pennsylvania.

(n)     [This paragraph is intentionally left blank.]

(o)     Borrower has furnished to Lender copies of Organizational Documents for any partner, manager or member of Borrower, as applicable, which will be executing any Loan Document for and on behalf of Borrower and which is a partnership, corporation, limited liability company or other organized entity, together with certificates of existence/good standing issued by the state in which such partner, manager or member was formed and resolutions authorizing such partner, manager or member to execute any documents required in connection with the extension of the Loan to Borrower.

(p)     Borrower has furnished to Lender an opinion or opinions of counsel which are acceptable to Lender and Lender's counsel.

(q)     Borrower has furnished to Lender an environmental site assessment report in form and substance acceptable to Lender that at a minimum meets the Standard Practice for Environmental Site Assessments: Phase I, Environmental Site Assessment Process, ASTM E-1527 of the American Society for Testing and Materials, which satisfied the federal "All Appropriate Inquiries" rule set forth in 40 CFR Part 312 as of

the date Borrower acquired title to the Real Estate, prepared and certified by an environmental consultant acceptable to Lender, stating that there are not present on, under, in or about the Project any Hazardous Substances and that the condition of the Real Estate currently complies with all applicable state and federal environmental protection laws.

(r)     Lender has received, reviewed and approved an appraisal of the Real Estate and Improvements conforming to Title XI of the Financial Institution Reform, Recovery & Enforcement Act of 1989 and stating a market value of not less than the amount required by Lender for the underwriting of the Loan.  Such appraisal shall be certified to Lender, made by an appraiser acceptable to Lender which is licensed by the State in which the Project is located and shall be in form and substance acceptable to Lender.

(s)     Reserved.

(t)     Borrower shall furnish to Lender a copy of each executed non-residential lease affecting any portion of the Project and all such leases must contain terms and conditions acceptable to Lender.

(u)     Reserved.

(v)     Reserved.

(w)     Lender shall have received a physical capital needs assessment with respect to the Project, which report shall be acceptable to Lender in its reasonable discretion.

(x)     Lender shall have received copies of the Management Agreement, which shall be acceptable to Lender in its reasonable discretion.  Lender shall have received appropriate instruments acceptable to Lender subordinating the Management Agreement to the Security Instrument.

Section 4.2.    <u>Conditions to be Satisfied in a Manner Acceptable to Lender</u>.    All conditions required to have occurred or be satisfied under Section 4.1 shall have occurred or have been satisfied in a manner acceptable to Lender and its counsel.  All documents required to be delivered to Lender under Section 4.1 shall be reasonably satisfactory in form and substance to Lender and its counsel.

Section 4.3.    <u>No Waiver of Full Compliance</u>.    Any of the conditions set forth in Section 4.1 may be waived by Lender at the time of the advancement; however, any such waiver by Lender at the time of the advancement shall not be deemed or construed as a waiver of the right of Lender to require full compliance with all conditions precedent.  In the event Lender, in its sole discretion, shall require further evidence of the occurrence or satisfaction of any condition precedent set forth in Section 4.1 or in the event circumstances occur whereby any condition precedent is no longer wholly satisfied, Lender may at any time require Borrower to provide further evidence of the occurrence or satisfaction of any condition precedent set forth in Section 4.1.

**ARTICLE V**
**RESERVED**

**ARTICLE VI**
**RESERVED**

**ARTICLE VII**
**PAYMENT OF FEES AND EXPENSES**

Section 7.1.    Payment of Loan Fees and Expenses.  In addition to all of the terms and conditions to be performed by Borrower under this Agreement, Borrower shall pay to Lender at the time of the execution of this Agreement, if Borrower has not previously paid, a commitment and service fee in the amount set forth in the Fee Letter.  Such fee shall be paid in consideration of and in order to induce Lender to make the Loan and to reimburse Lender for its time, effort and expense in the loan approval and closing process.  Borrower acknowledges and agrees that the full amount of such fee shall be earned by Lender upon the execution of this Agreement by Borrower and is not refundable in the event the Loan is paid prior to its maturity.  In addition, Borrower shall reimburse Lender upon demand for all costs and expenses incurred by it in connection with the Loan, including but not limited to premiums and fees of title insurance companies, recording fees, lien search fees, survey expenses, the fees of inspecting architects or engineers, fees and expenses of Lender's counsel, appraisal fees, fees for environmental studies, mortgage/deed of trust and intangible taxes and other miscellaneous expenses connected with the Loan.  Borrower also shall pay upon written demand all fees charged by Lender in connection with Lender's review of any appraisal reports, inspection reports, environmental reports and any other reports or material required to be provided in connection with the Loan.  All of such fees, costs and expenses may be deducted by Lender from the advancements made hereunder.

Section 7.2.    Fees and Expenses Incurred; Enforcing Loan Documents.  Borrower shall pay to Lender, or its legal representatives, successors and assigns, the costs and expenses, including but not limited to attorneys' fees and legal expenses, incurred by Lender in connection with (i) the exercise of any right or remedy available to it under this Agreement or under any of the other Loan Documents, whether or not suit is commenced, (ii) the enforcement of any provision contained in this Agreement or in any of the other Loan Documents, and (iii) the collection of any indebtedness or obligations outstanding in connections with the Loan.  If, after the occurrence of an Event of Default hereunder, Lender employs an attorney or attorneys to protect Lender's rights or remedies arising in connection with this Agreement or any security for the Loan, then Borrower shall pay to Lender upon written demand all attorneys' fees and expenses incurred by Lender in connection with such Event of Default, regardless of whether any action is actually commenced against Borrower by reason of any such Event of Default.

Section 7.3.    Payment of Related Expenses.  Borrower shall, immediately upon written demand, pay or reimburse Lender for all attorneys' fees and expenses incurred by Lender in any proceedings involving the estate of a deceased Borrower or Guarantor, an insolvent or a bankrupt Borrower or Guarantor, or in any action, proceeding or dispute of any kind in which Lender is made a party, or appears as an intervenor or party plaintiff or defendant, affecting or relating to this Agreement or any of the other Loan Documents, Borrower, or the Project, including, without

limitation, the foreclosure of the Security Instrument, any condemnation action involving the Project, or any action to protect the security for the Loan.

Section 7.4.    <u>Rebuttable Presumption Regarding Fees, Costs and Expenses</u>. Notwithstanding anything contained herein to the contrary, any provision contained in this Agreement or in any Loan Document requiring the reimbursement of any fee, cost or expense incurred by Lender, including without limitation attorney's fees, shall be deemed to be limited to reasonable fees, costs and expenses incurred by Lender, including reasonable attorneys' fees.

Section 7.5.    <u>Amounts Payable Upon Demand</u>.    Any amounts payable by Borrower pursuant to this Article VII shall be due and payable upon demand unless otherwise expressly stated in this Agreement.

Section 7.6.    <u>No Advancement if Fees and Expenses are Unpaid</u>.    Lender, in its sole discretion, shall not be obligated to fund any additional advances of the Loan until Borrower has paid all amounts then due under this Article VII.    Furthermore, Lender hereby reserves the right (without any obligation) to disburse to itself under the Loan, any or all of such amounts which are not received by Lender within ten (10) days after written demand has been made by Lender for such payment.

## ARTICLE VIII
## WARRANTIES AND REPRESENTATIONS

Section 8.1.    <u>Warranties and Representations</u>.    Borrower warrants and represents to Lender that:

(a)    Borrower is a limited partnership duly organized and validly existing under the laws of the Commonwealth of Pennsylvania, and has full power under its Organizational Documents, and any amendments thereto, and under all applicable provisions of law to purchase, own, lease and operate the Project and is qualified to transact business in the Commonwealth of Pennsylvania;

(b)    Borrower is the owner in fee simple of the Real Estate (or shall acquire title with the proceeds of the advancement of the Loan) subject only to encumbrances approved by Lender;

(c)    No security interests in or title retention claims exist against any Personal Property except for the lien and security interest granted in favor of Lender;

(d)    All governmental authorizations, certificates, licenses, filings, registrations, consents, approvals and permits necessary to (i) make, execute and deliver this Agreement, and (ii) perform all of its obligations under this Agreement, have been obtained and no appeal thereof is pending or threatened;

(e)    The Real Estate directly abuts a publicly dedicated and maintained road or street and has legal access to the same through governmentally approved curb cut permits or no such permits are required for legal access or has access to such a road or street through an easement benefitting the Project;

(f)    All required federal, state and other tax returns have been filed by or on behalf of Borrower and the taxes in connection therewith paid to date and no additional taxes or assessments have been asserted or are anticipated;

(g)    There is no litigation, or proceeding pending or, to the knowledge of Borrower, threatened against or otherwise affecting Borrower or any of its properties or assets, before any court or before or by any governmental agency;

(h)    There is no litigation, or proceeding pending or, to the knowledge of Borrower, threatened against or otherwise affecting any Guarantor or any properties or assets of any Guarantor, before any court or before or by any governmental agency which would materially and adversely impact the ability of any Guarantor to perform its obligations under the Guaranty executed by such Guarantor;

(i)    None of the representations or warranties set forth in this Agreement or in any document or certificate taken together with any related document or certificate furnished pursuant to this Agreement or in connection with the transactions contemplated hereby contains or will contain any untrue statements of a material fact or omits or will omit to state a financial fact necessary to make any statement of fact contained herein or therein, in light of the circumstances under which it was made, not misleading;

(j)    The execution of this Agreement and all other agreements, instruments and documents executed by in connection herewith, the consummation of all transactions connected herewith, have been duly authorized by all necessary action required on the part of the applicable Person;

(k)    Each of the Loan Documents has been duly authorized, executed and delivered by Borrower and is legal, valid, binding and enforceable against Borrower in accordance with its terms;

(l)    If any Guarantor is an individual, each such Guarantor is of legal age and is under no legal disability, and has all power, authority, permits, consents, authorizations and licenses necessary to execute, deliver and perform the Indemnity Agreement, the Guaranty to which such Guarantor is a party and any other document to be executed and delivered by such Guarantor in connection with the Loan;

(m)    The Indemnity Agreement, each Guaranty, and any other document to be executed and delivered by each Guarantor in connection with the Loan has been duly authorized, executed and delivered by each Guarantor, as applicable, so as to constitute the valid and binding obligations of each such Guarantor, enforceable in accordance with their respective terms;

(n)    Borrower has provided true and accurate copies of all documents and agreements relating to Borrower and its members/partners material to the operation of the Project and there are no other agreements existing material to the operation of the Project between Borrower and its members/partners;

(o)     Neither the execution of this Agreement (or the consummation of the transactions contemplated hereby) nor compliance with the terms and provisions hereof or of any agreements, documents and instruments required of Borrower hereunder conflict with, result in a breach of or constitute a default under the terms, conditions or provisions of the Organizational Documents of Borrower or any amendments thereto, any agreement to which Borrower is a party or by which Borrower is bound or to Borrower's knowledge any law, regulation, order, writ, injunction or decree of any court or governmental agency or instrumentality having jurisdiction;

(p)     If any Guarantor is a limited liability company, a corporation, a partnership or other legally created entity, neither the execution of the Guaranty (or the consummation of the transactions contemplated thereby) nor compliance with the terms and provisions thereof or of any agreements, documents and instruments required of such Guarantor under the Guaranty executed by such Guarantor conflict with, result in a breach of or constitute a default under the terms, conditions or provisions of the Organizational Documents of such Guarantor or any amendments thereto, any agreement to which such Guarantor is a party or by which such Guarantor is bound or any law, regulation, order, writ, injunction or decree of any court or governmental agency or instrumentality having jurisdiction;

(q)     To the best of Borrower's knowledge after diligent inquiry, Borrower is in full compliance with all federal, state and local health, safety, building, zoning, environmental and other statutes, regulations and ordinances;

(r)     To the best of Borrower's knowledge after diligent inquiry, Borrower is in full compliance with all federal, state and local laws, statutes and ordinances, rules or regulations pertaining to Wetlands;

(s)     Reserved;

(t)     The financial statements of Borrower and each Guarantor heretofore delivered to Lender are true and correct in all material respects and fairly present the financial condition of Borrower and each Guarantor as of the dates indicated therein, and there has been no material adverse change in the financial condition of Borrower or any Guarantor since the date of such statements.

(u)     Any and all employee pension plans of Borrower are in full compliance with the terms and provisions of the Employee Retirement Income Security Act of 1974 and all other federal, state and local statutes, regulations and ordinances governing the establishment and administration of pension plans;

(v)     The Loan is being incurred by Borrower solely for the purpose of carrying on a business or commercial enterprise, and not for personal, family or household purposes and the Note evidences a business loan exempt from the Federal Truth in Lending Act (15 USC 1601, et seq.), Regulations G, U, X and Z of the Board of Governors of the Federal Reserve System, and the Indiana Uniform Consumer Credit Code (IC 24-4.5-3-101, et seq.);

(w)    Borrower and its Affiliates are in compliance in all material respects with the PATRIOT Act;

(x)    Neither Borrower nor any Guarantor is a "foreign person" within the meaning of Section 1445 or 7701 of the Internal Revenue Code; and

(y)    (i) Borrower is not now engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System); (ii) no part of the proceeds of any credit hereunder has been or will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock; and (iii) no part of the proceeds of any credit hereunder has been or will be used for any purpose that violates or which is inconsistent with the provisions of Regulations G, U or X of said Board of Governors.

## ARTICLE IX
## COVENANTS

Section 9.1.    <u>Covenants of Borrower</u>.  So long as Borrower has any liability to Lender hereunder or under or with respect to the Loan or any agreement, instrument or document executed in connection herewith, Borrower covenants and agrees as follows:

(a)    Borrower will use the proceeds of the Loan solely for the purpose of acquiring the Project and for no other purpose.

(b)    Borrower will comply in all material respects with all the terms of, and take all actions necessary to comply in all material respects with, this Agreement, including without limitation executing and delivering to Lender such other documents as it may require to carry out the terms and provisions of this Agreement.

(c)    Borrower will promptly pay and discharge all taxes, assessments and governmental charges which may be lawfully levied, assessed or imposed upon it or its properties, or upon its income or profits, and all lawful claims for labor, material and services which, if unpaid, might become a lien or charge against any of the Project; provided, however, that Borrower shall have the right to contest in good faith any such tax, assessment, charge, levy or claim by appropriate proceedings without the prior payment thereof unless payment is required to contest.

(d)    Borrower will keep and safeguard accurate and complete books and records, and maintain the same, together with all valuable papers and records at Borrower's principal offices or its Manager's office.

(e)    Borrower will defend, or cause to be defended, at all times any adverse claim by a third party relating to the possession of or any interest in the assets of Borrower.

(f)    Borrower will furnish, or cause to be furnished, to Lender, at Borrower's expense, the following financial statements and other information:

(i)    As soon as available and in any event within one hundred twenty (120) days following the end of each calendar year, (i) operating statements for Borrower which shall include the balance sheet and annual statements of income and surplus accounts as of and for the calendar year then ended, all in reasonable detail, prepared in accordance with generally accepted accounting principles applied on a consistent basis throughout the periods involved and audited, if requested by Lender, by an independent certified public accountant which shall furnish to Lender a standard unqualified opinion regarding such financial statements, (ii) a cash flow analysis for Borrower for the calendar year then ended in such form and in such detail as Lender may require, and (iii) a current rent roll for the Project in such form and in such detail as Lender may require;

(ii)    Within thirty (30) days following the end of each calendar quarter, (i) operating statements for Borrower which shall include the balance sheet and quarterly statements of income and surplus accounts as of and for the calendar quarter then ended, all in reasonable detail, prepared in accordance with the generally accepted accounting principles applied on a consistent basis throughout the periods involved and (ii) a current rent roll for the Project in such form and in such detail as Lender may require;

(iii)    As soon as available and in any event within thirty (30) days from the filing deadline (or extended filing deadline if evidence of such extension is provided to Lender), a copy of the federal income tax return for Borrower for the calendar year then ended;

(iv)    If at any time the financial statements for Borrower on file with Lender are more than twelve months old, within thirty (30) days of receiving a request from Lender, current financial statements for Borrower on such form and in such detail as Lender may require; and

(v)    From time to time at such times as Lender may reasonably require, such further information regarding the business affairs and financial conditions of Borrower as Lender may reasonably require, including but not limited to, a certified rent roll, accounting and management recommendations and certificates of no default under this Agreement, all in form and detail reasonably satisfactory to Lender.

Borrower shall deliver to Lender at the same time as the delivery of any annual, quarterly or monthly financial statement required hereunder (i) a description in reasonable detail of any material variation between the application of accounting principles employed in the preparation of such statement and the application of accounting principles employed in the preparation of the immediately preceding annual, quarterly or monthly financial statements and (ii) reasonable estimates of the difference between such statements arising as a consequence thereof.

(g)    Borrower will furnish, or cause to be furnished, to Lender, at Borrower's expense, the following financial statements and other information relating to each Guarantor:

      (i)    As soon as available and in any event within ninety (90) days following the end of each calendar year, for each Guarantor, a current schedule of real estate owned on such form and in such detail as Lender may require;

      (ii)    As soon as available and in any event within ninety (90) days following the end of each calendar year, a current annual financial statement for each Guarantor on such form and in such detail as Lender may require;

      (iii)    As soon as available and in any event within thirty (30) days of the filing deadline (or extended filing deadline if evidence of such extension by a Guarantor is provided to Lender) after the end of each calendar year, a copy of the federal income tax return for each Guarantor for the calendar year then ended; and

      (iv)    If at any time the financial statement for any Guarantor on file with Lender is more than twelve months old, within thirty (30) days of receiving a request from Lender, a current financial statement for each such Guarantor on such form and in such detail as Lender may require.

(h)    Upon forty eight (48) hours prior written notice, Borrower will permit any authorized representative of Lender and its attorneys and accountants to inspect, examine and make copies and extracts of the books of account and records of Borrower at reasonable times during normal business hours.

(i)    Borrower will permit any authorized representative of Lender, including but not limited to its attorneys and inspectors, to enter upon and inspect and examine the Project at reasonable times during normal business hours, subject to the rights of tenants under leases.

(j)    Borrower will give prompt written notice to Lender of any process or action taken or pending whereby a third party is asserting a material claim against Borrower or any of its assets.

(k)    Borrower will pay when due all costs, expenses, fees, and other charges incurred in connection with the acquisition of the Project, the operation of the Project, provided however, Borrower shall have the right to contest in good faith by appropriate legal or other proceedings the validity or amount of any lien, levy, or attachment imposed upon all or any portion of the Project, provided that (i) Borrower gives Lender prior written notice of its intent to contest the same, (ii) Borrower demonstrates to the reasonable satisfaction of Lender that such legal or other proceedings shall operate to prevent the sale of the Project (or any portion thereof) to satisfy payment of the amount being contested prior to final determination of such proceedings, (iii) Borrower causes the Title Insurance Company to provide to Lender such affirmative coverages and endorsements to the Title Insurance Policy as Lender may require to insure the priority of the lien of the Security Instrument over the lien of any such lien, levy, or attachment, and

(iv) if required by Lender, Borrower provides a sufficient undertaking as may be required or permitted by law to accomplish the discharge or release of any such lien, levy, or attachment as to the Project.

(l)      Borrower will maintain all operating accounts with Lender.

(m)      Borrower will maintain insurance coverage with respect to itself and the Project in such amounts and in form and with insurers acceptable to Lender; and, upon request by Lender, shall furnish to Lender evidence of such insurance coverage and payment of premiums therefore; such insurance coverages shall include at a minimum the following:

(i)      Commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Project, such insurance (A) to be on the so-called "occurrence" form, (B) with an occurrence limit of not less than One Million and 00/100 ($1,000,000.00) and an aggregate limit of not less than Two Million and 00/100 ($2,000,000.00) for the primary coverage; (C) include a minimum umbrella/excess liability coverage above the primary insurance, of not less than (1) One Million and 00/100 ($1,000,000.00) for Projects with one to two stories, (2) Two Million and 00/100 ($2,000,000.00) for Projects with three to four stories, (3) Five Million and 00/100 ($5,000,000.00) for Projects with five to ten stories, (4) Ten Million and 00/100 ($10,000,000.00) for Projects with eleven to twenty stories and (5) Twenty-Five Million and 00/100 ($25,000,000.00) for Projects with more than twenty stories, (C) providing for a maximum deductible equal to or less than (1) Twenty-Five Thousand Dollars ($25,000.00) for primary coverage and (2) Ten Thousand Dollars ($10,000.00) for umbrella/excess liability coverages, (D) to continue at not less than the aforesaid limit until required to be changed by Lender by reason of changed economic conditions making such protection inadequate or changed due to changes in the standard practice of lenders in the business of making loans secured by collateral similar to the Project; and (E) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; and (4) blanket contractual liability for all legal contracts. All such policies shall name Lender as an additional insured.

(ii)      Comprehensive all risk or "Special Causes of Loss" insurance on the Project (A) in an amount equal to one hundred percent (100%) of the full replacement cost value of the Improvements, which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing an agreed amount endorsement with respect to the Improvements and personal property at the Project waiving all co-insurance provisions; (C) providing for a maximum deductible equal to or less than (1) Twenty-Five Thousand Dollars ($25,000.00) for single project policies and (B) the lesser of one percent (1%) of the total replacement values or Two Hundred Fifty Thousand Dollars ($250,000.00) for blanket policies; and (D) shall also

insure costs of demolition and increased cost of construction. If the Project contains any type of non-conformance under current building, zoning or land use laws, then such policy shall also include ordinance and law coverage in an amount not less than (1) loss of undamaged portion of the Project in an amount equal to one hundred percent (100%) of replacement cost value of the Project less the damage threshold of the local building ordinance, (2) loss for demolition of the damaged portion of the Project in an amount equal to ten percent (10%) of replacement cost value of the Project and (3) loss for increased cost of construction of the damaged portion of the Project in an amount equal to ten percent (10%) of replacement cost value of the Project. For blanket policies (policies covering more than one project), the policy must be an amount sufficient to fully protect the Project as if a separate policy was issued for one hundred percent (100%) of the replacement cost at the time of the loss. If the all risk or "Special Causes of Loss" insurance on the Project excludes wind/hail coverages, then the Project must have a separate windstorm policy (A) in an amount equal to one hundred percent (100%) of the full replacement cost value of the Improvements, which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; and (B) providing for a maximum deductible equal to or less than the greater of (1) ten percent (10%) of the Project replacement value, (2) Twenty-Five Thousand Dollars ($25,000.00) for single project policies and (3) the lesser of one percent (1%) of the total replacement values of the projects or Two Hundred Fifty Thousand Dollars ($250,000.00) for blanket policies. All policies shall name Lender as a "mortgagee" on a non-contributing New York type of standard mortgagee clause or an equivalent endorsement satisfactory to Lender and as "Loss Payee" as respects rental/business income insurance. Such insurance shall include such special coverages as Lender may require, including without limitation coverage for earthquakes and mudslides if the Project is located in an area which Lender determines is an area which is at risk for such events.

(iii)    If any centralized HVAC, boiler, water heater or other type of pressure-fired vessel is in operation at the Project, comprehensive boiler and machinery insurance covering all physical damage, rent loss and improvements loss (A) in an amount equal to one hundred percent (100%) of the replacement costs of the Project, (B) providing for a maximum deductible equal to or less than (1) Twenty-Five Thousand Dollars ($25,000.00) for single project policies and (2) the lesser of one percent (1%) of the total replacement values or Two Hundred Fifty Thousand Dollars ($250,000.00) for blanket policies and (C) naming Lender as "mortgagee" on a non-contributing Standard Mortgagee Endorsement providing that any loss payable thereunder shall be paid to Lender.

(iv)    If any Project building or "structure" (as such term is defined in the National Flood Insurance Act of 1968 or other applicable law is currently or at any time in the future located in a federally designated "special flood hazard area" (such buildings or structures are hereinafter referred to as a "**Structure**"), then Borrower will procure and maintain flood hazard insurance (A) in an amount

equal to the lesser of the replacement cost of such Structures or maximum available under the National Flood Insurance Act, (B) with rent loss with a maximum deductible equal to or less than the greater of five percent (5%) of the insurable value of such Structures or the maximum allowed under the National Flood Insurance Act of 1968 and (C) rent loss coverage for a minimum of twelve (12) months' gross rental income for such Structures but, regardless of (A), (B) and (C) above, with such coverages as may be required to comply with any requirement of the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973, the National Flood Insurance Reform Act of 1994 or the Biggert-Waters Flood Insurance Reform Act of 2012, or any other applicable federal, state or local statute, regulation or ordinance concerning flood hazard areas, as each may be amended.  Such flood insurance shall be (A) obtained prior to the effective date of this Agreement, or if the Improvements are first designated to be in a special flood hazard area after the effective date of this Agreement, within forty-five (45) days after notice is given by Lender of such designation, (B) maintained until the Loan is paid in full and all obligations of Lender to advance additional indebtedness to Borrower are terminated, and (C) purchased under the National Flood Insurance Program or from private insurers as may from time to time be approved by Lender.  Borrower agrees to deliver to Lender prior to the effective date of this Agreement, or if the Improvements are first designated to be in a special flood hazard area after the effective date of this Agreement, within forty-five (45) days after notice is given by Lender of such designation, written evidence of the flood insurance coverage required hereby together with receipts evidencing payment in full of the premiums thereon, in such form as Lender may require and naming Lender as a mortgagee and loss payee thereon.  Borrower acknowledges and agrees that if Borrower fails at any time to provide Lender with such written evidence in form and substance acceptable to Lender that the flood insurance required hereby is in full force and effect, then Lender may obtain, at Borrower's expense, flood insurance for the Improvements in an amount acceptable to Lender.  The cost of any such insurance shall be added to the indebtedness evidenced by the Loan and Borrower agrees to reimburse Lender upon demand for all costs and expenses incurred by Lender in connection with such insurance.  Borrower acknowledges that, if Lender purchases any such flood insurance, such flood insurance will provide limited protection against physical damage to the Project and may not be adequate to protect the interests of Borrower therein.  Borrower waives all claims and defenses with respect to Lender as to whether such insurance is adequate to protect the interests of Borrower in the Project.  For purposes of obtaining insurance coverage on the Premises, Borrower authorizes Lender to provide to any person (including any insurance agent or company) all information Lender deems appropriate, whether regarding the Project, the indebtedness secured hereby or other financial accommodations, or both.

(v)    Coverage for claims under worker's compensation, disability benefits and other similar employee benefit acts which are applicable to any construction of the Improvements and/or the development of the Project in an amount equal to the statutory limit in the state where the Project is located.  If

Borrower has any employees, then worker's compensation insurance in an amount equal to the lesser of One Hundred Thousand and 00/100 Dollars ($100,000.00) or the statutory limit in the state where the Project is located. All such policies shall name Lender as a certificate holder.

(vi)    If liquor is sold on the Project, liquor liability coverage in such amounts and with such special coverages as Lender may require.

(vii)    Rent loss insurance, without a co-insurance provision, in an amount which is not less than (A) twelve (12) months of the gross rental income from the Project based upon the most recent Project financial statements and (B) if the outstanding principal balance of the Loan exceeds Twenty-Five Million and 00/100 Dollars ($25,000,000.00), three (3) additional months, with a loss payable clause in favor of Lender, such insurance to be carried with such company or companies and upon such terms and conditions as Lender may require.

(viii)    Employee fidelity coverage for employees of the Project in an amount which is not less than two (2) months of gross rental income from the Project, with a maximum deductible of Twenty-Five Thousand and 00/100 Dollars ($25,000.00), such insurance to be carried with such company or companies and upon such terms and conditions as Lender may require. All such policies shall name Lender as an additional insured.

(ix)    If Borrower owns, leases or rents any automobiles, then evidence of automobile insurance in an amount of not less than One Million and 00/100 Dollars ($1,000,000.00) for liability and Fifty Thousand and 00/100 Dollars ($50,000.00) for property damage.

(x)    If Borrower is a non-profit or cooperative, then evidence of directors and officers liability in an amount of not less than One Million and 00/100 Dollars ($1,000,000.00), with a maximum deductible of Twenty-Five Thousand and 00/100 Dollars ($25,000.00) and no exclusion for sanctions imposed by the federal government.

(xi)    Such other types and amounts of insurance with respect to Borrower, the Project, the Improvements and the operation thereof that are commonly maintained by prudent owners of other property and buildings similar to the Project in nature, use, location, height, and type of construction, as may from time to time be reasonably required by Lender.

All such policies of insurance shall (i) have a term of not less than twelve (12) months, (ii) contain waiver of subrogation clauses, and (ii) require at least ten (10) days' prior written notice to Lender before cancellation due to nonpayment and thirty (30) days' prior written notice before cancellation for any other reason. Borrower shall be named as insured on each policy of insurance. Lender shall be referenced as "Merchants Bank of Indiana, its successors and assigns as their interests may appear, 410 Monon Boulevard, Carmel, Indiana 46032" for the purposes of all applicable mortgagee, loss payee and additional insured provisions. All insurance

coverages required by this Agreement and the other Loan Documents must be provided by insurance companies acceptable to Lender that are rated at least an "A- VI" or better by Best's Insurance Guide. All insurance policies shall contain terms and conditions acceptable to Lender. Borrower shall provide to Lender an original or duplicate copy of the applicable insurance policies listed above and evidence of payment of premiums thereon provided however Lender will accept the most recent version of the ACCORD 28 "Evidence of Commercial Property Insurance" or ACCORD 75 "Insurance Binder" as temporary evidence of the coverages listed above but Borrower must provide Lender an original or duplicate copy of the applicable insurance policies listed above within ninety (90) days of the earlier of (i) the date of such ACCORD form or (ii) the date hereof.

(n)    Borrower will pay to Lender, to apply to the Loan or as otherwise provided for under the terms of the Security Instrument, all proceeds received from casualty and business interruption insurance or condemnation proceedings.

(o)    Borrower will not carry any separate insurance on the Project concurrent in kind or form with any insurance required hereunder or contributing in the event of loss without Lender's prior written consent and, in the event Lender grants its consent, any such policy shall nevertheless have attached thereto a standard non-contributing mortgagee clause, with loss payable to Lender, and shall otherwise meet all other requirements set forth in this Agreement and in the Security Instrument.

(p)    Borrower will maintain at all times Borrower's existence in good standing under the laws of the Commonwealth of Pennsylvania, and shall (1) retain its name as set forth on page 1 hereof, (2) maintain its existence in good standing in each state in which it conducts business, and, (3) cause at all times Borrower to be qualified to transact business in the Commonwealth of Pennsylvania.

(q)    Reserved.

(r)    Borrower will comply in all material respects with all the terms of, and take all actions necessary to comply in all material respects with and keep in full force and effect any document executed by Borrower in connection with any Rate Management Transaction.

(s)    Borrower will notify Lender, upon Lender's request at any time and from time to time, of all sites at which Borrower is conducting business or at which inventory, equipment or other assets of Borrower are located.

(t)    Borrower will provide to Lender, promptly upon its execution, a copy of each contract executed by Borrower that is material to the operation of Borrower's businesses, and give prompt written notice to Lender of any act of default by Borrower under any existing or future contract, which default could have a material adverse effect on the financial condition or business operations of Borrower, or any acceleration of any indebtedness caused thereby.

(u)    Borrower will comply with all applicable federal, state and local statutes, regulations and ordinances.

(v)    Borrower will indemnify and hold Lender harmless from and against any and all claims, losses, damages, setoffs, counterclaims or expenses (including attorneys' fees and costs) which Lender may sustain as a result of the transactions evidenced by this Agreement or because of the breach of or inaccuracy in any of the representations and warranties contained in this Agreement or in any other document executed in connection herewith or in any other written communication to Lender in connection with the transactions secured hereby whether or not any such inaccuracy was known by Borrower to be incorrect.

(w)    Borrower will indemnify, defend and hold Lender harmless from and against any claim, loss or damage to which Lender is subjected as a result of the presence of any Hazardous Material or the use, handling, storage, transportation or disposal thereof within or upon any real estate owned by Borrower or violation of the covenants, representations and warranties contained in this Agreement.

(x)    Borrower will notify Lender immediately in writing of the initiation of any criminal investigation or proceeding initiated by any federal, state or local agency, department, or instrumentality against (i) Borrower, (ii) any Guarantor, or (iii) any employee of Borrower if such investigation or proceeding could have a material adverse effect on the financial condition, business operations or assets of Borrower or result in any collateral granted to Lender in connection with the Loan being seized pursuant to 18 U.S.C. Sec. 1963, 21 U.S.C. Sec. 853, 21 U.S.C. Sec. 881, 46 App. U.S.C. Sec. 1904, I.C. 34-24-1 et seq. or any similar federal, state or local law and/or regulation adopted in publications promulgated pursuant to such laws, or as such laws or regulations may be further amended, modified or supplemented.

(y)    Borrower will not create or permit to exist any mortgage, deed of trust, collateral assignment, pledge, security interest, title retention device or other encumbrance on the Project or any other property, right, or asset owned or hereafter acquired by Borrower, except for any mortgage, deed of trust or security interest held by Lender and those liens and encumbrances as shall be approved in writing by Lender in its sole discretion.

(z)    Other than in the ordinary course of business for fair value, Borrower will not cause or permit any of Borrower's property, business or assets to be sold, assigned, leased, conveyed, pledged, disposed of or otherwise transferred without fair and adequate consideration.

(aa)    Borrower will not directly or indirectly make (i) any loan, gift, distribution, transfer or advance of cash or other real, personal or intangible property, or (ii) any transfer of any other benefit or thing of value to any person except for fair value received by Borrower; it is intended that this paragraph prohibit, by way of example and not by way of limitation, any payment by Borrower characterized as a commission or referral fee, and any payments by Borrower characterized as the consideration for a purchase to the extent that such payment is not bona fide or exceeds the real value received by Borrower.

26

(bb)    Borrower will not assume, guarantee or otherwise become liable as guarantor or surety for the obligation of any person or entity except in connection with the endorsement of checks for deposit in the ordinary course of business and other similar collection transactions in the ordinary course of business.

(cc)    Borrower acknowledges and agrees that Lender shall have the right to obtain a new appraisal of the Project (or an update of any existing appraisal of the Project) at any time while the Loan or any portion thereof remains outstanding when, in Lender's reasonable judgment, such an appraisal is warranted, appropriate or advisable in order to comply with any statutes, rules, regulations or directives of governmental agencies having jurisdiction over Lender.  Borrower agrees to pay on written demand by Lender, all expenses, charges, costs and fees incurred by Lender in connection with each such appraisal obtained by Lender, provided however, Borrower shall not be required to pay for more than one appraisal per calendar year but such limitation shall not apply for any appraisal ordered during any period in which an Event of Default exists hereunder or with respect to any appraisal obtained in connection with any modification or amendment of the Loan.  Borrower shall cooperate with Lender's appraiser in providing reasonable access to the Project and such other information as Lender and/or such appraiser reasonably requires for purposes of completing such appraisal.  Any such appraisal shall be the property of Lender, but Borrower shall be entitled to a copy.

(dd)    Borrower will not incur any indebtedness or make any financial arrangements for borrowed money other than (i) the Loan and any subsequent indebtedness to Lender and (ii) unsecured trade and operational debt incurred in the ordinary course of business in amounts not to exceed two percent (2%) of the original principal amount of the Loan, in the aggregate, having maturities of less than ninety (90) days.

(ee)    Borrower will not perform or allow to be performed any excavation or fill activity or other acts which would in any way destroy, eliminate, alter, obstruct, interfere with or otherwise affect any Wetlands.

(ff)    Borrower will not take any action, allow any event to occur or permit a condition to exist which could materially and adversely affect Borrower's ability to complete its obligations under the terms of this Agreement, the Note, Security Instrument or any other instruments, agreements or documents required of Borrower hereunder.

(gg)    Borrower will not change, or permit to be changed, the nature of Borrower's business.

(hh)    Borrower will not make any change, or permit any changes, in the key management of Borrower.

(ii)    Borrower will not sell, convey, transfer, further mortgage, change the form of ownership, or encumber or dispose of the Project, or any part thereof, or any interest therein (including without limitation any right to collect any income therefrom) except as expressly permitted under the Loan Documents.

(jj)    Borrower will not enter into any consolidation, acquisition or merger.

(kk)    Reserved.

(ll)    Borrower shall remain at all times a single purpose entity in compliance with the SPE Requirements.

(mm)    Borrower shall not use, occupy, or permit the use or occupancy of any of the Real Estate by Borrower or any lessee, tenant, licensee, permittee, agent, or any other person in any manner that would be a violation of any applicable federal, state or local law or regulation, regardless of whether such use or occupancy is lawful under any conflicting law, including without limitation any law relating to the use, sale, possession, cultivation, manufacture, distribution or marketing of any controlled substances or other contraband (whether for commercial, medical, or personal purposes), or any law relating to the medicinal use or distribution of marijuana (collectively, "**Prohibited Activities**"). Borrower shall upon written demand provide Lender with a written statement setting forth its compliance with this section and stating whether any Prohibited Activities are or may be occurring in, on or around the Real Estate. If Borrower becomes aware that any lessee is likely engaged in any Prohibited Activities, Borrower shall, at the request of Lender and in compliance with applicable law, terminate the applicable lease and take all actions permitted by law to discontinue such activities. Borrower shall keep Lender fully advised of its actions and plans to comply with this section and to prevent Prohibited Activities. This section is a material consideration and inducement upon which Lender relies in extending credit and other financial accommodations to the undersigned. Failure by the undersigned to comply with this section shall constitute an Event of Default. Notwithstanding anything in this Agreement, the Security Instrument, the Note or any other Loan Document regarding rights to cure Events of Default, Lender is entitled upon breach of this section to immediately exercise any and all remedies under this Agreement, the Note, the Security Instrument, any other Loan Document, and by law. In addition and not by way of limitation, Borrower shall indemnify, defend and hold Lender harmless from and against any loss, claim, damage, liability, fine, penalty, cost or expense (including attorneys' fees and expenses) arising from, out of or related to any Prohibited Activities at or on the Real Estate, Prohibited Activities by Borrower or any lessee of the Real Estate, or Borrower's breach, violation, or failure to enforce or comply with any of the covenants set forth in this section. This indemnity includes, without limitation any claim by any governmental entity or agency, any lessee, or any third person, including any governmental action for seizure or forfeiture of any Real Estate (with or without compensation to Lender, and whether or not Real Estate is taken free of or subject to Lender's lien or security interest).

(nn)    Borrower shall not permit the aggregate payments to the Manager pursuant to the Management Agreement to exceed the payments owed to the Manager pursuant to the Management Agreement in effect as of the date hereof (the "Management Fee"), without the prior written consent of Lender, and from and after the occurrence of an Event of Default, make any payments of the Management Fee to Manager except in accordance with the terms and provisions of the Management Agreement Assignment.

(oo)    Borrower will commence the repairs set forth on the Critical Repair List as soon as practicable after the date of this Agreement and will diligently proceed with and complete the Critical Repair Work on or before one hundred twenty days following the effective date hereof in a workmanlike manner, consistent with good building practices and all applicable laws, ordinances, rules and regulations.

(pp)    Borrower shall not make any Restricted Distribution unless (i) there exists no Event of Default or event which with the giving of notice or the lapse of time would become an Event of Default, and (ii) after such distribution or payment adequate reserves exist for the payment of ongoing debt service, deferred maintenance and operating expenses for the Project, and (iii) Borrower has caused the operation of the Project to achieve a Debt Service Coverage Ratio - Distribution greater than 1.35 to 1 for the calendar year in which the distribution is made with the Debt Service Coverage Ratio – Distribution being calculated pre-distribution. Notwithstanding the foregoing, Borrower may make Restricted Distributions for the purpose of paying preferred equity interest payments required under Borrower's Organizational Documents so long as there exists no Event of Default or event which with the giving of notice or the lapse of time would become an Event of Default.

(qq)    Borrower shall implement the O&M Plans at the Project in a manner satisfactory to Lender in its reasonable discretion.

Section 9.2.    <u>Management Agreement</u>.

(a)    Lender shall have the right in its reasonable discretion to approve any management company with respect to the management, marketing and other services of the Project.  For so long as Manager is a professional property management company approved by Lender, the property management services of the Project shall be provided by Manager.  Such management arrangement shall be pursuant to a written Management Agreement approved by Lender.  In no event shall any Manager be removed or replaced or any Management Agreement modified, amended, extended, terminated, canceled or replaced without the prior written consent of Lender in Lender's reasonable discretion.

## ARTICLE X [RESERVED]

## ARTICLE XI [RESERVED]

## ARTICLE XII
## EVENTS OF DEFAULT

Section 12.1.  <u>Events of Default</u>.  The occurrence of any of the following events or circumstances shall constitute an event of default hereunder (each such occurrence is herein referred to as an "**Event of Default**"):

(a)    A failure by Borrower to pay, within five (5) days when due, any installment of interest or principal due and payable pursuant to the terms of this Agreement or the Note;

(b)    A failure by Borrower or any other obligor to pay, within ten (10) days upon demand or when due, any other amounts due and payable pursuant to the terms of the Note, the Security Instrument, this Agreement or any of the other Loan Documents;

(c)    A failure by Borrower to maintain any insurance policies as required under this Agreement or any of the other Loan Documents and the continuation of such failure for a period of ten (10) days after written notice of such failure has been sent to Borrower;

(d)    A default under or a failure by Borrower to observe or perform any other agreement or covenant contained in this Agreement or in any of the other Loan Documents which default or failure can be cured by the payment of money and the continuation of such default or failure for a period of ten (10) days after written notice of such default or failure has been sent to Borrower;

(e)    The occurrence of a Prohibited Transfer;

(f)    A default under or a failure by Borrower to observe or perform any other agreement or covenant contained in this Agreement or in any of the other Loan Documents and the continuation of such default or failure for a period of thirty (30) days after written notice of such default or failure has been sent to Borrower; provided, however, that if the nature of a default is such that it can be cured by Borrower but cannot be cured within the thirty (30) day period provided above or by the payment of money by Borrowers and if Borrower (i) commences efforts to effect such cure within such thirty (30) day period and thereafter diligently proceeds to take such actions as may be reasonably required to effect such cure and (ii) provides written notice to Lender within such thirty (30) day period describing what efforts it has commenced and intends to continue to effect such cure, the thirty (30) day cure period provided above shall be extended for a period ending the earlier of (i) sixty (60) days after the expiration of such thirty (30) day cure period provided above, (ii) the date as of which Borrower shall cease the diligent pursuit of such actions as may be reasonably required to effect such cure, or (iii) the date as of which the cure of such default by Borrower shall become impossible;

(g)    Any warranty, representation, certification or statement made by Borrower in this Agreement, in any of the other Loan Documents or in any certification or other agreement or document executed or delivered in connection herewith is false or incorrect in any material respect upon the date when made or deemed to be made or repeated;

(h)    The occurrence of an "Event of Default" under the Note, the Security Instrument or any of the other Loan Documents (for purposes of this paragraph, an "Event of Default" shall mean the occurrence of any event or circumstance which is either defined as, or would constitute, an "event of default" under the terms of such Loan Document);

(i)    With respect to any Loan Document which does not contain an express definition for an "Event of Default", the occurrence of any default under such Loan Document and a failure to cure such default within the applicable cure period specified

therein, if any, or if no cure period is specified therein a failure to cure such default within thirty (30) days after written notice thereof is sent to Borrower; provided, however, that if the nature of a default is such that it can be cured by Borrower but cannot be cured within the thirty (30) day period provided above or by the payment of money by Borrowers and if Borrower (i) commences efforts to effect such cure within such thirty (30) day period and thereafter diligently proceeds to take such actions as may be reasonably required to effect such cure and (ii) provides written notice to Lender within such thirty (30) day period describing what efforts it has commenced and intends to continue to effect such cure, the thirty (30) day cure period provided above shall be extended for a period ending the earlier of (i) sixty (60) days after the expiration of such thirty (30) day cure period provided above, (ii) the date as of which Borrower shall cease the diligent pursuit of such actions as may be reasonably required to effect such cure, or (iii) the date as of which the cure of such default by Borrower shall become impossible;

(j)     A failure to make any payment when due of any of the taxes, assessments, charges, liens, fees or reimbursements as required under the terms of the Security Instrument and the continuation of such failure for a period of ten (10) days after written notice of such failure has been sent to Borrower;

(k)     The institution of any foreclosure proceeding by the holder of any mortgage, deed of trust, lien or security interest upon the Project, which proceeding remains undismissed for sixty (60) days after being instituted;

(l)     The Project being seized under any writ or process of court or by any trustee or receiver;

(m)     The failure at any time of (i) the Security Instrument to be a valid first lien upon the Project or any portion thereof (other than as a result of any release in writing by Lender) or (ii) the Lease Assignment to be a valid first lien and assignment of the leases, rents and income generated by the Project (other than as a result of any release in writing by Lender), subject only to the lien of taxes and assessments, use restrictions, rights of way and easements of record as of the date of the recording of the Security Instrument and the Lease Assignment, the rights of tenants in possession as of the date of the recording of the Security Instrument and the Lease Assignment and any other matter expressly consented to by Lender;

(n)     In the event any Loan Document ceases to continue to be in full force and effect at any time and for any reason other than as a result of (i) a release or termination in writing of such Loan Document by Lender, or (ii) the termination of such Loan Document by its express terms;

(o)     In the event any mechanic's lien or other lien shall be asserted or filed against the Project and such lien shall not be released, bonded over or insured over by the Title Insurance Company in a manner satisfactory to Lender within sixty (60) days after the assertion or filing thereof;

(p)    The dissolution, liquidation, winding-up or termination of Borrower or the business of Borrower;

(q)    The occurrence of any material organizational change in Borrower, or any Guarantor or their respective members, partners or venturers, including, without limitation, any member, partnership or joint venture dispute which Lender determines, in its sole and absolute discretion, shall have a material adverse effect on the Loan, on the Project, or on the ability of Borrower or any Guarantor or their respective members, partners and venturers to perform their obligations under the Loan Documents;

(r)    A consolidation or merger of Borrower or a sale or transfer of all or substantially all of its assets;

(s)    An assignment by Borrower for the benefit of its creditors;

(t)    The appointment of a receiver, trustee, custodian or liquidator for Borrower or any of its assets, which appointment is consented to or, if not consented to, shall not be removed or discharged within ninety (90) days after such appointment;

(u)    The filing of a petition by or on behalf of Borrower for relief under the Bankruptcy Code, or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law, which petition is consented to or, if involuntary, remains undismissed for ninety (90) days after such filing;

(v)    The occurrence of a material adverse change in the financial condition of Borrower, as determined by Lender in its sole reasonable discretion;

(w)    One or more judgments for the payment of money shall have been entered against Borrower or any Guarantor, which judgment or judgments exceed One Hundred Thousand and 00/100 Dollars ($100,000.00) in the aggregate with respect to Borrower or any such Guarantor, and such judgment or judgments shall have remained undischarged and unstayed for a period of ninety (90) consecutive days;

(x)    An assignment by any Guarantor for the benefit of its creditors;

(y)    The appointment of a receiver, trustee, custodian or liquidator for any Guarantor or any of its assets, which appointment is consented to or, if not consented to, shall not be removed or discharged within ninety (90) days after such appointment;

(z)    The filing of a petition by or on behalf of any Guarantor for relief under the Bankruptcy Code, or under any other present or future state or federal law regarding bankruptcy, reorganization or other debtor relief law, which petition is consented to or, if involuntary, remains undismissed for ninety (90) days after such filing;

(aa)    A failure by any Guarantor to pay within ten (10) days upon demand or when due any amounts due under a Guaranty or under any of the other Loan Documents executed by any Guarantor;

(bb)    The occurrence of any other default under any Guaranty and a failure to cure such default within the applicable cure period specified therein, if any; provided, however, that if the nature of a default is such that it can be cured by Borrower or Guarantor but cannot be cured within the thirty (30) day period provided above or by the payment of money by Borrower or Guarantor and if Borrower or Guarantor (i) commences efforts to effect such cure within such thirty (30) day period and thereafter diligently proceeds to take such actions as may be reasonably required to effect such cure and (ii) provides written notice to Lender within such thirty (30) day period describing what efforts it has commenced and intends to continue to effect such cure, the thirty (30) day cure period provided above shall be extended for a period ending the earlier of (i) sixty (60) days after the expiration of such thirty (30) day cure period provided above, (ii) the date as of which Borrower and Guarantor shall cease the diligent pursuit of such actions as may be reasonably required to effect such cure, or (iii) the date as of which the cure of such default by Borrower and Guarantor shall become impossible;

(cc)    Any Guarantor gives written notice to Lender that (i) such Guarantor contests liability for any obligations under the Guaranty executed by such Guarantor or under the Indemnity Agreement, (ii) such Guarantor does not intend to be liable for any future obligations under the Guaranty executed by such Guarantor or under the Indemnity Agreement, or (iii) such Guarantor attempts to cancel or terminate the Guaranty executed by such Guarantor or the Indemnity Agreement;

(dd)    The death or insolvency of any Guarantor and the failure of Borrower to provide a substitute guarantor acceptable to Lender, in its sole but reasonable discretion, within ninety (90) days after such death or insolvency;

(ee)    Any representation or warranty made or deemed to be made by or on behalf of any Guarantor in this Agreement or in any of the other documents executed by a Guarantor in connection herewith, or in any report, certificate, financial statement, document or other instrument delivered pursuant to or in connection with this Agreement, is false or incorrect in any material respect upon the date when made or deemed to be made or repeated;

(ff)    The occurrence of an "Event of Default" under the Facility B Loan Documents (for purposes of this paragraph, an "Event of Default" shall mean the occurrence of any event or circumstance which is either defined as, or would constitute, an "event of default" under the terms of the Facility B Loan Documents);

(gg)    In the event the Title Insurance Company refuses to insure under the Title Insurance Policy the first lien priority of the Security Instrument on the Project with respect to any advancement of the Loan as required for an advancement under this Agreement and the continuation of such refusal for a period of ten (10) days after written notice of such refusal has been sent to Borrower; or

(hh)    A determination by Lender, in its sole reasonable discretion, that any action, inaction, commission, omission or circumstance has occurred or may occur which may subject any assets of Borrower, including but not limited to the Real Estate and

Improvements, to be seized by any federal, state or local governmental department, agency or instrumentality pursuant to 18 U.S.C. Sec. 1963, 21 U.S.C. Sec. 853, 21 U.S.C. Sec. 881, 46 App. U.S.C. Sec. 1904 or any similar federal, state or local laws and/or regulations adopted in publications promulgated pursuant to such laws, or as such laws or regulations may be amended, modified or supplemented from time to time.

Notwithstanding anything expressed or implied in this Section to the contrary, if Lender is prevented or prohibited by any applicable provision of the Bankruptcy Code or other applicable law from giving Borrower a notice of default hereunder, then in such event with respect to any default for which this Section provides that notice shall be given (i) no notice of a default shall be given to Borrower and any requirement that notice of a default must be given in order for an Event of Default to have occurred hereunder shall be deemed eliminated, and (ii) any applicable cure period which this Section provides shall follow such notice shall run from the occurrence of the event or condition of default rather than from the date of notice.

## ARTICLE XIII
## REMEDIES

Section 13.1.  <u>Remedies</u>.  Upon the occurrence and during the continuance of any Event of Default hereunder, Lender may, in its sole discretion without further notice or demand to Borrower, pursue any one or more of the following rights, powers and remedies concurrently or successively, it being the intent hereof that none of such rights, powers and remedies shall be to the exclusion of any other:

(a)    Declare all of the indebtedness evidenced by the Note and remaining unpaid, including without limitation the entire unpaid principal balance, any accrued and unpaid interest, all prepayment premiums payable under the Note, if any, and all other amounts payable under the Note, to be immediately due and payable, anything contained herein or in the Note to the contrary notwithstanding;

(b)    Withhold making any further advancement under the Loan;

(c)    Perform all acts necessary for the performance, sale, collection and enforcement of any collateral securing the Loan, including without limitation the collateral covered by the Security Instrument, and/or any agreement or document executed in connection herewith;

(d)    Exercise any of the various rights, powers and remedies provided in any of the Loan Documents, including without limitation foreclosure of the Security Instrument or the exercise of any applicable power of sale permitted under the law of the State where the Project is located;

(e)    Seek the appointment of a receiver to take possession of the Project and to operate the Project;

(f)    Without demand or notice of any kind, apply any funds of Borrower on deposit with or in the possession of Lender toward the payment of any indebtedness outstanding under the Loan, in such manner of application as Lender may choose; and

34

(g)     In addition to the rights, powers and remedies herein expressly conferred upon Lender, Lender shall be entitled to exercise all rights, powers and remedies available to Lender by law or at equity.

Section 13.2.   <u>Rights Not Exclusive</u>.  All rights and remedies of Lender herein specified or contained in any of the Loan Documents are cumulative and in addition to, not in limitation of, any rights and remedies which it may have by law or at equity.  Enforcement by Lender of any security for Borrower's obligations under or in connection with the Loan or this Agreement, or enforcement by Lender of any guaranty of the indebtedness and obligations under the Loan, shall not constitute an election by Lender of remedies so as to preclude the exercise of any other right or remedy available to Lender.

Section 13.3.   <u>No Waiver</u>.   Lender may exercise any remedy available to Lender hereunder and under the other Loan Documents regardless of any prior forbearance.  No waiver of any default or failure or delay to exercise any right or remedy by Lender shall operate as a waiver of any other default or of the same default in the future or as a waiver of any right or remedy with respect to the same or any other occurrence.  The acceptance by Lender of (i) any payment after the due date of such payment, (ii) any payment in an amount which is less than the required payment, or (iii) the partial performance of any other obligation of Borrower arising under the Loan, shall not be a waiver of Lender's right to require prompt payment when due of all other payments, prompt performance of all other obligations or to exercise any right or remedy with respect to any failure to make prompt payment or perform such obligations.

Section 13.4.   <u>Un-Cured Defaults</u>.   Notwithstanding anything expressed or implied herein to the contrary, Lender shall have no obligation to make any advancement under the Loan during any period in which an event or circumstance exists that, with the giving of notice or the lapse of time, would become an event of default under the terms of this Agreement or any other Loan Document.  Without limitation, this shall include any period during which any failure, breach, or default specified under this Agreement or in any other Loan Document has occurred but the applicable cure period has not expired.

Section 13.5.   <u>Right to Order Updated Appraisal and Environmental Report</u>.  Upon the occurrence and during the continuance of an Event of Default hereunder, at the option of Lender and without further notice or demand to Borrower, Lender may (i) order an appraisal of the Project, to be in such form and scope and to be performed by an appraiser as Lender may choose in its sole discretion, and (ii) order a current phase I environmental assessment of the Project, to be in such form and scope and to be performed by an engineer as Lender may choose in its sole discretion.   All costs and expenses of such appraisal and environmental assessment shall be immediately paid by Borrower upon demand by Lender and such amounts shall be added to the indebtedness evidenced by the Loan and secured by the Security Instrument.

Section 13.6.   <u>Cooperation by Borrower</u>.   Upon the occurrence and during the continuance of an Event of Default hereunder, Borrower, immediately upon demand by Lender, shall assemble all collateral for the Loan and make it available to Lender at a place or places to be designated by Lender which are reasonably convenient to Lender and Borrower.  Borrower recognizes that in the event Borrower fails to perform, observe or discharge any of its obligations under this Agreement or any other documents executed in connection herewith, Lender shall be

entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

Section 13.7.   No Liability of Lender.   Whether or not Lender elects to employ any or all of the remedies available upon the occurrence and during the continuance of an Event of Default, Lender shall not be liable for the construction of or failure to construct, rehabilitate, complete or protect the Improvements or the Project or for payment of any expenses incurred in connection with the exercise of any remedy available to Lender or for the performance or non-performance of any other obligation of Borrower.

Section 13.8.   Continuance of an Event of Default.   Notwithstanding anything contained herein or in any other Loan Document to the contrary, from and after the occurrence of an Event of Default, an Event of Default shall exist hereunder until such time as Lender expressly waives such Event of Default by written agreement which written agreement will also expressly address the extent to which Lender's remedies under the Loan Documents are suspended by reason of such waiver, at which time such Event of Default shall cease; provided, however, the termination of such Event of Default shall in no way impair Lender's right to declare an Event of Default in the future for the occurrence of a different Event of Default or the reoccurrence of the event which constituted such Event of Default.

**ARTICLE XIV**
**RESERVED**

**ARTICLE XV**
**RESERVED**

**ARTICLE XVI**
**GENERAL CONDITIONS AND MISCELLANEOUS**

Section 16.1.   Electronic Images and Uniform Electronic Transactions Act.   Lender shall be permitted, from time to time, to create electronic images of any Loan Document and to destroy paper originals of any imaged Loan Document other than the Note and Borrower hereby acknowledges and consents to such electronic imaging.   Borrower hereby agrees that any electronic images of Loan Documents maintained by Lender shall be given the same legal effect as the paper originals of such Loan Documents.   Borrower hereby agrees that Lender may convert any Loan Document to a "transferable record" as that term is defined in the Uniform Electronic Transactions Act ("UETA").   Any images of a Loan Document maintained by Lender shall constitute an "authoritative copy" under the UETA.

Section 16.2.   Successors and Assigns.   This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Lender and Borrower provided that no assignment or alienation of any rights or obligations by Borrower shall be effective without the prior written consent of Lender, and further provided that any party who takes any rights or obligations of Borrower by assignment, alienation or otherwise shall assume all of the rights and obligations of Borrower the same as if such party were an original party to this Agreement.   No assignment or alienation (except to Lender) of any rights or obligations of Borrower hereunder shall be effective without the prior written consent of Lender.

Section 16.3.   No Third-Party Beneficiaries.   Nothing contained herein shall be deemed or construed to create an obligation on the part of Lender to any third party nor shall any third party have a right to enforce against Lender any rights which Borrower may have under this Agreement.

Section 16.4.   No Waiver.   No waiver by Lender of the breach of any term, condition, warranty, representation, covenant or agreement contained herein or in the agreements, instruments, guaranties or documents delivered pursuant thereto shall be considered as a waiver of the same default in the future or any other default and no delay or omission by Lender in exercising any right or remedy hereunder shall impair any such right or remedy or be construed as a waiver of any default.   The acceptance by Lender of any payment after the due date of such payment, or in an amount which is less than the required payment, shall not be a waiver of Lender's right to require prompt payment when due of all other payments or to exercise any right or remedy with respect to any failure to make prompt payment.   The inclusion of deadlines and the references to dates later than the maturity of any obligation shall not by implication or otherwise obligate Lender to renew or extend any maturity.

Section 16.5.   Waiver of Presentment.   Borrower waives presentment, demand and protest and notice of presentment, maturity, release, compromising settlement, extension or renewal of any or all promissory notes, commercial paper, accounts receivable, contract rights, documents, instruments, chattel paper and guaranties entered into by Borrower in connection herewith and at any time held by Lender and on which Borrower may be liable in any way.

Section 16.6.   Amendments.   Any modification of or amendment to this Agreement shall be ineffective unless in writing and signed by the duly authorized representatives of Borrower and Lender.

Section 16.7.   Additional Rights of Lender.   Lender may from time to time without notice to Borrower (a) release any collateral or substitute or exchange any collateral, (b) release, modify or compromise any liability of Borrower, the Guarantors or any other obligor, or the terms thereof and (c) apply any amounts paid to Lender with such marshaling of security as Lender may, in its sole discretion, determine appropriate; all without the consent of or proper notice to Borrower.   The liability of Borrower shall not be released in part or in whole by reason of the foregoing, the addition of co-makers, endorsers, guarantors or sureties, or a failure to perfect any security interest or lien in any collateral or a failure to proceed in any particular manner with respect to any collateral.

Section 16.8.   Preferences.   To the extent that Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations arising hereunder and under the Note, or such part thereof intended to be satisfied, shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 16.9.   Notices.   Any written notice required or permitted to be given to Lender or to Borrower hereunder shall be deemed effective when (a) mailed by certified United States

mail, postage prepaid with return receipt requested or (b) sent by an overnight carrier which provides for a return receipt, to the applicable address specified below:

<table>
<tr><td>If to Borrower:</td><td>PAEX Landmark Square PA LP<br>10 Hill Street, Suite 1E<br>Newark, New Jersey 07102<br>Attention: Aron Puretz</td></tr>
<tr><td>If to Lender:</td><td>Merchants Bank of Indiana<br>410 Monon Boulevard, 5th Floor<br>Carmel, Indiana 46032<br>Attention: Lauren E. Campbell</td></tr>
</table>

or at such other address as either Borrower or Lender may from time to time specify by notice hereunder. Any notice may be given on behalf of Lender or Borrower by such party's legal counsel. Notwithstanding anything contained herein to the contrary, any notice required to be given by Lender of a sale, lease, other disposition of the collateral or any other intended action by Lender, deposited in the United States Mail postage prepaid duly addressed as specified above no less than ten (10) days prior to such proposed action, or if sent by overnight carrier five (5) days prior to such proposed action shall constitute commercially reasonable and fair notice to Borrower of same.

Section 16.10. <u>Prior Agreements</u>. This Agreement replaces and supersedes any inconsistent provisions of any agreements heretofore made by Lender and Borrower. This Agreement and the other Loan Documents are intended to be complementary and supplementary to one another. In the event of any conflict between the terms of one or more thereof, such terms shall, to the fullest extent reasonably possible, be construed to be complementary. However, if such terms cannot be construed as complementary, then the terms of this Agreement shall govern.

Section 16.11. <u>No Partnership/Joint Venture</u>. It is hereby acknowledged by Lender and Borrower that the relationship between them created hereby and by any other document executed in connection with the Loan is that of creditor and debtor and is not intended to be and shall not in any way be construed to be that of a partnership, a joint venture or that of principal and agent; and it is hereby further acknowledged that any control of or supervision over the construction of the Improvements by Lender or disbursement of the Loan to anyone other than Borrower shall not be deemed to make Lender a partner, joint venture or principal or agent of Borrower, but rather shall be deemed to be solely for the purpose of protecting Lender's security for the indebtedness evidenced by the Note and other indebtedness of Borrower to Lender.

Section 16.12. <u>Advertising</u>. Borrower agrees and authorizes Lender, if Lender desires, for a reasonable period of time to place a sign on the Real Estate (subject to applicable zoning ordinances and governmental approvals) advertising this financing or may otherwise refer to or describe this financing in its advertising.

Section 16.13. <u>Governing Law</u>. This Agreement has been entered into and shall be governed by and construed in accordance with the laws of the State of Indiana, notwithstanding

that Indiana conflicts of law rules might otherwise require the substantive rules of law of another jurisdiction to apply.

Section 16.14. <u>Brokers</u>.  Borrower hereby represents to Lender that it has not dealt with or engaged the services of any broker, underwriter, placement agent, or finder in connection with the Loan.  Borrower hereby agrees to indemnify and hold Lender harmless from and against any and all claims, liabilities, losses, costs and expenses of any kind in any way relating to or arising from a claim by any party that such party acted on behalf of Borrower in connection with the Loan and is owed a fee or commission.

Section 16.15. <u>Survival of Indemnities</u>.  All indemnities from Borrower to Lender set forth in this Agreement shall survive this Agreement.

Section 16.16. <u>Invalidity of Any Provision</u>.  It is the intent of this Agreement to confer to Lender the rights and benefits hereunder to the full extent allowable by law.  If any provision (or a portion thereof) of this Agreement or of any other document executed in connection herewith is held invalid or unenforceable or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable (each such provision, or applicable portion thereof, is herein referred to as an **"Invalid Provision"**), then (i) the remainder of this Agreement, or the application of such Invalid Provision to any other person or circumstance, shall be valid and enforceable to the fullest extent permitted by law, (ii) the Invalid Provision shall be deemed to be severable in such instance, and (iii) Borrower and Lender shall negotiate an equitable adjustment in the provisions of the same in order to effect, to the maximum extent permitted by law, the purpose of this Agreement.

Section 16.17. <u>Authorization to Complete Blanks</u>.  Borrower authorizes Lender or its agents to complete any blanks relating to the effective date of any such Loan Documents, the maturity date of the Note, the address of any party to the Loan Document or the effective date of any other document referenced herein or therein.

Section 16.18. <u>Additional Actions</u>.  Upon the request from time to time of Lender, Borrower shall execute and deliver such additional instruments, documents and agreements and shall take such further actions as may be reasonably requested by Lender to effectuate the transactions contemplated by this Agreement.

Section 16.19. <u>Participants and Assignment</u>.  Lender may transfer participation interests in the Loan or assign the Loan, in whole or in part, without notice or consent by Borrower and without restriction as to type of participant or assignee.  Borrower agrees that Lender may deliver any and all information, including financial information, in Lender's possession concerning Borrower, Guarantors or the Project, to any prospective participant or assignee.

Section 16.20. <u>No Lender Liability</u>.  To the extent permitted by applicable law, Lender shall have no liability to Borrower or any third party for any loss, damage, injury, cost or expense resulting from any action or omission by Lender, or any of its representatives, which was taken, omitted or made in good faith in connection with the Loan, this Agreement or any of the Loan Documents.

Section 16.21. <u>Interpretation</u>.  The parties agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Agreement or any amendments or schedules hereto.  All references herein to a party's best knowledge shall be deemed to mean the best knowledge of such party based on a commercially reasonable inquiry.  Unless specified to the contrary herein, all references herein to an exercise of discretion or judgment by Lender, to the making of a determination or designation by Lender, to the application of Lender's discretion or opinion, to the granting or withholding of Lender's consent or approval, to the consideration of whether a matter or thing is satisfactory or acceptable to Lender, or otherwise involving the decision making of Lender, shall be deemed to mean that Lender shall decide unilaterally using its sole and absolute discretion or judgment.  Where it expressly specifies herein, or in any of the Loan Documents, that the exercise of discretion or judgment by Lender shall be reasonable or that any consent, approval, decision or other determination by Lender shall not be unreasonably withheld, it is intended to mean that (i) Lender shall act in a commercially reasonable manner in the exercise of such discretion or judgment and in considering any such consent, approval, decision or other determination, and (ii) any such any consent, approval, decision or other determination by Lender shall not be unreasonably withheld, conditioned or delayed.  Where it expressly specifies herein, or in any of the Loan Documents, that a decision or determination shall be in the sole discretion of Lender, it is intended to mean that Lender shall decide unilaterally using its sole and absolute discretion or judgment.  When used in this Agreement or in any other Loan Document, the term "gross negligence" shall be deemed to mean a conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences as affecting any other party to such Loan Document and the Project.

Section 16.22. <u>USA Patriot Act Notice; Compliance</u>.  The PATRIOT Act and federal regulations issued with respect thereto require all financial institutions to obtain, verify and record certain information that identifies each individual or business entity which opens an "account" or establishes a relationship with such financial institution.  Consequently, Lender may from time-to-time request, and Borrower shall provide to Lender, (i) Borrower's name, address, tax identification number, date of birth, and other information that will allow Lender to identify Borrower, (ii) the name, address, tax identification number, date of birth, and other information that will allow Lender to identify each guarantor of the Loan, (iii) the name, address, tax identification number, date of birth, and other information that will allow Lender to identify each officer, partner, member, shareholder or other stakeholder of Borrower, and/or (iv) such other identification information as shall be necessary for Lender to comply with federal law.  Borrower shall provide such information and take such actions as are reasonably requested by Lender in order to assist Lender in maintaining compliance with the PATRIOT Act.  An "account" for this purpose may include, without limitation, a deposit account, cash management service, a transaction or asset account, a credit account, a loan or other extension of credit, and/or other financial services product.

Section 16.23. <u>Waiver of Trial by Jury</u>.  Borrower and Lender hereby agree that any suit, action or proceeding, whether a claim or counterclaim, brought or instituted by any party on or with respect to this Agreement or any other document executed in connection herewith or which in any way relates, directly or indirectly to the Note or any event, transaction or occurrence arising out of or in any way connected with this Agreement or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury.  BORROWER AND LENDER

HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING. Borrower acknowledges that Borrower may have a right to a trial by jury in any such suit, action or proceeding and that Borrower hereby is knowingly, intentionally and voluntarily waiving any such right. Borrower further acknowledges and agrees that this Section is material to this Agreement between Borrower and Lender and that adequate consideration has been given by Lender and received by Borrower in exchange for the waiver made by Borrower pursuant to this Section.

Section 16.24. <u>Submission to Jurisdiction</u>. Borrower acknowledges that the office of Lender from which the Loan is being originated is located in Hamilton County, Indiana and that Lender may be irreparably harmed if required to institute or defend any action in any jurisdiction other than a local, state or federal court located within Hamilton County, Indiana. Therefore, Borrower irrevocably agrees that any suit, action or other legal proceeding arising directly, indirectly or otherwise in connection with, out of, related to or from the Loan, the Note, this Agreement or any of the other Loan Documents may be brought in either (i) a court located within Hamilton County, Indiana or (ii) a court located within the Commonwealth of Pennsylvania, where the real estate encumbered by the Security Instrument is located. Furthermore, Borrower irrevocably (i) consents and submits to the jurisdiction of any local, state or federal court located within Hamilton County, Indiana and within the Commonwealth of Pennsylvania, (ii) waives any objection which Borrower may have to the laying of venue in any suit, action or proceeding in any such courts, and (iii) waives any claim that any such suit, action or proceeding has been brought in an inconvenient forum. Notwithstanding anything contained in this paragraph to the contrary, Lender shall have the right to commence and litigate any suit, action or proceeding against Borrower or any property of Borrower in any court of any other appropriate jurisdiction. Nothing herein shall be deemed to limit any rights, powers or privileges which Lender may have pursuant to any law of the United States of America or any rule, regulation or order of any department or agency thereof and nothing herein shall be deemed to make unlawful any transaction or conduct by Lender which is lawful pursuant to, or which is permitted by, any of the foregoing.

Section 16.25. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall constitute an original though not fully executed, but all of which, when taken together, shall constitute but one instrument. Any party hereto may execute this Agreement by executing any such counterpart. The signature and acknowledgement page(s) of any counterpart may be detached from a counterpart [without impairing the legal effect of the signature(s) thereon] and attached to any other counterpart identical thereto except for the signature and acknowledgement page attached to it. Any executed counterpart which is transmitted to Lender or its attorneys by facsimile or electronic mail transmission shall be deemed to have been properly executed and delivered by all parties executing such counterpart for all purposes hereof to the same effect as if such original executed counterpart was delivered to Lender or its attorneys.

Section 16.26. <u>Captions</u>. The captions or headings herein have been inserted solely for the convenience of reference and in no way define or limit the scope, intent or substance of any provision of this Agreement.

[The remainder of this page is intentionally left blank]

<u>**SIGNATURE PAGE FOR BORROWER**</u>
<u>**TO LOAN AGREEMENT (FACILITY A)**</u>

      IN WITNESS WHEREOF, Borrower has caused this Agreement to be executed effective as of the day and the year first above written.

PAEX LANDMARK SQUARE PA LP,
a Pennsylvania limited partnership

By:    PAEX Landmark Apartment LLC,
       a Delaware limited liability company,
       its General Partner

By: _____
         Aron Puretz, Member

STATE OF _NJ_     )
               ) SS:
COUNTY OF _Ocean_  )

      Before me, a Notary Public in and for said County and State, personally appeared Aron Puretz, the Member of PAEX Landmark Apartment LLC, a Delaware limited liability company, which is the General Partner of PAEX Landmark Square PA LP, a Pennsylvania limited partnership, who, after having been duly sworn, acknowledged the execution of the foregoing Loan Agreement (Facility A) for and on behalf of such limited partnership.

      Witness my hand and Notarial Seal this _31_ day of _August_ , 2022.

                            _____
                            (                 ), Notary Public

My commission expires:         My County of residence:

_____       _____

              [Signatures continued on next page.]

*(Notary seal: SHOSHANA JOSEPH, NOTARY PUBLIC, STATE OF NEW JERSEY, MY COMMISSION EXPIRES NOVEMBER 10, 2024)*

### SIGNATURE PAGE FOR LENDER
### TO LOAN AGREEMENT (FACILITY A)

IN WITNESS WHEREOF, Lender has caused this Agreement to be executed effective as of the day and the year first above written.

MERCHANTS BANK OF INDIANA

By: _____

Philip Daubenmire, Vice President

This instrument was prepared by Michael A. Valinetz, Attorney-at-Law, Dinsmore & Shohl LLP, One Indiana Square, Suite 1800, Indianapolis, Indiana 46204.

## **<u>EXHIBITS:</u>**

Exhibit "A":     Description of Real Estate

Exhibit "B":     Critical Repairs List

## EXHIBIT "A"

## DESCRIPTION OF REAL ESTATE

PARCEL 1:

All that certain piece or parcel of land situate in the Third Ward of the City of Erie, County of Erie and Commonwealth of Pennsylvania, being the Easterly 30 feet of Lot No. 34 and all of Lot No. 35 in Block 3 on the Boulevard Park Re-Subdivision dated October 19, 1907 and recorded October 30, 1907 in the Recorder of Deeds Office of Erie County, Pennsylvania in Map Book 1, Page 349 and bounded and described as follows:

BEGINNING at the Southwesterly corner of the piece herein described at an iron survey Point found at the intersection of the Northerly right-of-way line of West Tenth Street, a 100 foot Right-of-Way, and the Easterly right-of-way line of Weschler Avenue, a 72 foot wide Right-of-Way; thence North 26° 02' 00" West, along the Easterly right-of-way line of Weschler Avenue, 103.12 feet to an iron survey point found; thence North 64° 00' 00" East, along the line common with lands now or formerly of Dennis C. and Lauren M. Brady, as described in Erie County Record Book 448, Page 1088, 71.25 feet to an iron survey point set; thence South 26° 02' 00" East, along the line common with lands now or formerly of Glen & Paula Stafford, as described in Erie County Record Book 300, Page 2311, 103.12 feet to an iron survey point found in the Northerly right-of-way line of West Tenth Street, aforesaid; thence South 64° 00' 00" West, along the Northerly right-of-way line of West Tenth Street, 71.25 feet to an iron survey point found, being the Point of Beginning.

Containing 0.169 acres of land.

Tax ID / Parcel Nos. 16-030-061.0-128.00 & 16-030-061.0-129.00

PARCEL 2:

All that certain piece or parcel of land situate in the Third Ward of the City of Erie, County of Erie and Commonwealth of Pennsylvania, being shown on an ALTA/NSPS Land Title Survey by Henry T. Welka & Associates dated June 3, 2019 and being more particularly bounded and described as follows to-wit:

BEGINNING at the Southeasterly corner of the piece herein described on the in the Northerly line of West 10th Street (a 100 foot right of way) being South 64' 00' 00' West a distance of 250 feet from the Westerly line of Weschler Avenue (a 72.00 foot right of way);

thence South 64' 00' 00" West along said Northerly line of West 10th Street a distance of 105.00 feet to the Southeasterly corner of lands now or formerly of Reed Manufacturing Company (Deed Book 1552, Page 392);

thence along said lands of Reed Manufacturing Company the following two courses:

North 26' 02' 00" West a distance of 113.00 feet;

thence North 64' 00' 00" East a distance of 105 feet to the Westerly line of lands now or formerly of DSSP, LLC (Instrument Number 2015-022049);

thence south 26' 00' 00" East along the Westerly line of DSSP, LLC a distance of 113.00 feet to the Point of Beginning.

Containing 0.272 acre (11,865 Sq. Ft).

Tax ID / Parcel No. 16-031-003.0-118.00

PARCEL 3:

All that certain piece or parcel of land situate in the Third Ward of the City of Erie, County of Erie and Commonwealth of Pennsylvania, bounded and described as follows, to-wit:

BEGINNING at the Northeasterly corner of the piece herein described at a Point at the intersection of the Westerly right-of-way line of Weschler Avenue, a 72 foot wide Right-of-Way, with the Southerly right-of-way line of Pearce Park, a 38 foot side Right-of-Way; thence South 26° 02' 00" East, along the Westerly right-of-way line of Weschler Avenue, 146.00 feet to an iron survey point found in the Northerly right-of-way line of West Eleventh Street, a 60 foot wide Right-of-Way; thence South 64° 00' 00" West, along the Northerly right-of-way line of West Eleventh Street, 300.90 feet to an iron survey point found in the Easterly right-of-way line of Amber Court, a 29 foot wide Right-of-Way; thence North 26° 02' 00" West, along the Easterly right-of-way line of Amber Court, 146.00 feet to an iron survey point found in the Southerly right-of-way line of Pearce Park, aforesaid; thence North 64° 00' 00" East, along the Southerly right-of-way line of Pearce Park,
300.90 feet to a point, being the point of beginning.

Containing 1.009 acres of land.

Tax ID / Parcel No. 16-031-002.0-200.00

PARCEL 4:

All that certain piece or parcel of land situate in the Third Ward of the City of Erie, County of Erie and Commonwealth of Pennsylvania, bounded and described as follows, to-wit:

BEGINNING at the Northeasterly corner of the piece herein described, at a point at the intersection of the Westerly right-of-way line of Weschler Avenue, a 72 foot wide Right-of-Way, with the Southerly right-of-way of West Tenth Street, a 100 foot wide Right-of-Way; thence South 26° 02' 00" East, along the Westerly right-of-way line of Weschler Avenue, 146.00 feet to a lead survey point found in the Northerly right-of-way line of Pearce Park, a 38 foot wide Right-of-Way; thence South 64° 00' 00" West, along the Northerly right-of-way line of Pearce Park, 300.90 feet to a lead survey point found in the Easterly right-of-way of Amber Court, a 29 foot wide Right-of-Way; thence North 26° 02' 00" West, along the Easterly right-of-way line of Amber Court, 146.00 feet to a lead survey point found in the Southerly right-of-way of West Tenth Street, aforesaid; thence North 64° 00' 00" East, along the Southerly right-of-way of West Tenth Street, 300.90 feet to a point, being the point of beginning.

Containing 1.009 acres of land.

Tax ID /  Parcel No. 16-031-002.0-300.00

PARCEL 5:

All that certain piece or parcel of land situate in the Third Ward of the City of Erie, County of Erie and Commonwealth of Pennsylvania, bounded and described as follows, to-wit:

BEGINNING at the Northeasterly corner of the piece herein described, at a lead survey Point found intersection of the Westerly right-of-way line of Amber court, a 29 foot wide Right-of-Way, with the Southerly right-of-way line of West Tenth Street, a 100 foot wide Right-of-Way; thence South 26° 02' 00" East, along the Westerly right-of-way line of Amber Court, 146.00 feet to a lead survey point found in the Northerly right-of-way line of Pearce Park, a 38 foot wide Right-of-Way; thence South 64° 00' 00" West, along the Northerly right-of-way line of Pearce Park, 311.00 feet to a lead survey point found in the Easterly right-of-way line of Abbey Lane (formerly West Drive), a variable width Right-of-Way; thence North 26° 02' 00" West, along the Easterly right-of-way line of Abbey Lane, 146.00 feet to an iron survey point found in the Southerly right-of-way line of West Tenth Street, aforesaid; thence North 64° 00' 00"

East, along the Southerly right-of-way line of West Tenth Street, 311.00 feet to a lead survey point, being the point of beginning.

Containing 1.042 acres of land.

Tax ID / As to Parcel No. 16-031-002.0-400.00

PARCEL 6:

All that certain piece or parcel of land situate in the Third Ward of the City of Erie, County of Erie and Commonwealth of Pennsylvania, bounded and described as follows, to-wit:

BEGINNING at the Northeasterly corner of the piece herein described at a Point at the intersection of the Westerly right-of-way line of Ambert Court, a 29 foot wide Right-of-Way, with the Southerly right-of-way line of Pearce Park, a 38 foot wide Right-of-Way; thence South 26° 02' 00" East, along the Westerly right-of-way line of Ambert Court, 146.00 feet to a point in the Northerly right-of-way line of West Eleventh Street, a 60 foot Right-of-Way; thence South 64° 00' 00" West, along the Northerly right-of-way line of West Eleventh Street, 311.00 feet to a point in the Easterly right-of-way line of Abbey Lane (formerly West Drive), a variable width Right-of-Way; thence No. 26° 02' 00" West, along the Easterly right-of-way line of Abbey Lane, 146.00 feet to a point in the Southerly right-of-way line of Pearce Park, aforesaid; thence North 64° 00' 00" East, along the Southerly right-of-way line of Pearce Park, 311.00 feet to a point, being the point of beginning.

Containing 1.042 acres of land.

Tax ID /  Parcel No. 16-031-002.0-500.00

PARCEL 7:

All that certain lot or parcel of land situate in the Third Ward of the City of Erie, County of Erie and Commonwealth of Pennsylvania, being Lot 1 on Abbey Lane Subdivision, Third Ward - Tract 23 - City of Erie, dated February 4, 1975 and recorded February 28, 1975 in the Recorder of Deeds Office of Erie County, Pennsylvania in Map Book Map Book 10, Page 63.

BEGINNING at the Northeasterly corner of the piece herein described, at a point at the Northerly terminus of the Westerly right-of-way line of Abbey Lane (formerly West Drive), a variable width Right-of-Way, said point being South 64° 00' 00" West, a distance of 20.24 feet from the intersection of the centerline of Abbey Lane with the centerline of West Tenth Street, a 100 foot Right-of-Way; thence South 25° 59' 56" East, along the Westerly right-of-way line of Abbey Lane, 380.24 feet to a point; thence South 64° 00' 15" West, along the line common with lands now or formerly of Erie Diesel & Truck Service, Inc., as described in Erie County Deed Book 1069, page 493, 190.60 feet to a point; thence North 26° 24' 54" West, continuing along lands of Erie Diesel & Truck Service, Inc., 61.52 feet to an iron survey point found; thence North 04° 15' 21" West, along the Easterly line of land now or formerly of Penn Advertising, Inc., as recorded in Erie County Record Book 313, Page 1035, 282.46 feet to a point; thence along the Easterly right-of-way line of the Bayfront Parkway, a variable width Right-of-Way, it being a curve to the left, having a radius of 550.30 feet, an arc distance of 67.35 feet to a point; thence North 64° 00' 00" East, along the line of common with lands now or formerly of the Reed Manufacturing Company, as described in Erie County Deed Book 1552, Page 392, 49.59 feet to a point, being the Point of Beginning.

Containing 1.192 acres of land.

TAX ID / Parcel No. 16-031-004.0-106.00

PARCEL 8:

All that certain piece or parcel of land situate in the Third Ward of the City of Erie, County of Erie and Commonwealth of Pennsylvania, being shown on an ALTA/NSPS Land Title Survey by Henry T. Welka & Associates dated June 3, 2019 and being more particularly bounded and described as follows to-wit:

Beginning at Southeasterly corner of the piece herein described on the Northerly line of West 10th Street (a 100.00 foot right of way), being South 64' 00' 00" West a distance of 220.00 feet from the Westerly line of Weschler Avenue (72.00 foot right of way);

thence South 64' 00' 00" West along said Northerly line of West 10th Street a distance of 30.00 feet to the Southeasterly corner of lands now or formerly of Landmark Square Apartments II, LLC (Instrument Number 2013-005698);

thence North 26' 02' 00" West along the Easterly line of lands now or formerly of Landmark Square Apartments II, LLC for a distance of 113.00 feet thence continuing along lands now or formerly Reed Manufacturing Co. (Deed Book 1552, Page 392) for a distance of 52.00 feet, in all a total of 165 feet;

thence North 64' 00' 00" East continuing along said lands of Reed Manufacturing Co. a distance of 30.00 feet to the Northwesterly corner of lands now or formerly of Cynthia A. Lorellu (Record Book 308, Page 2315);

thence South 26' 02' 00" East along the Westerly line of said lands of Cynthia A. Lorelli a distance of 165.00 feet to the Point of Beginning.

Containing 0.1136 acre (4,950 Sq. Ft.)

Tax ID /  Parcel No. 16-031-003.0-119.00

TOGETHER WITH a non-exclusive easement for ingress and egress access as well as parking as further described in the Easement Agreement from the City of Erie to Ashwood partners LLC recorded September 18, 2006, in the Recorder of Deeds Office of Erie County, Pennsylvania in Record Book 1361, Page 2368.

AS TO PARCELS 1 - 7:\line\line Being the same premises which Landmark Square Apartments II, LLC, an Ohio limited liability company by Deed dated June 17, 2019 and recorded July 2, 2019 in Erie County in Instrument No. 2019-012683 conveyed unto Erie Landmark Real Estate Partners, L.P., a Pennsylvania limited liability company, in fee.

AS TO PARCEL 8:

Being the same premises which DSSP, LLC, an Ohio limited liability company by Deed dated June 17, 2019 and recorded July 2, 2019 in Erie County in Instrument No. 2019-012684 conveyed unto Erie Landmark Real Estate Partners, L.P., a Pennsylvania limited liability company, in fee.

## EXHIBIT "B"

## CRITICAL REPAIRS LIST

| Item | Quantity | Unit | Unit Cost | Total Cost | Brief Description |
|---|---|---|---|---|---|
| Minor concrete flatwork repairs | 300 | SF | $8.00 | $2,400 | The concrete-paved sidewalks, concrete steps, and concrete walkways throughout the subject property were observed to be in generally good to fair condition. Evidence of damaged concrete steps, settled concrete walkways, and cracking along the walkways was observed at some entrances and service walkways. An allotment has been included in the Immediate Repairs for repairs to the more notable damaged flatwork. Replacements of all of the walkways and other flatwork at this time would be considered a business decision. Maintenance and minor repairs to the other flatwork over the loan term can be conducted as part of normal operating costs. |
| Exterior - Façade repairs | 30 | Per Building | $4,000.00 | $120,000 | The exterior walls appear to be in fair condition overall. Loss of paint and staining were observed along the various wood trim (including fascia boards). The metal flashing above cornices and door surrounds appear to have failed as evidenced by the wood rot at these locations. Cracks were noted on some of the window lintels and sills. Open caulking joints were observed around some of the windows. Spalling and cracking bricks were noted along the parapet walls of some of the 3-story buildings. Step-like cracks that follow the brick joints were observed. Such cracks are usually not indicative of differential settlement, but may be attributed to horizontal moisture and thermal expansion stresses. Some of the cracks appeared to have been previously pointed but, the cracks have re-opened. Essentially, these re-emergent cracks have become the wall's expansion joint. Parapet copings appear to have been improperly waterproofed with mastic coating or rubber patches that have failed. Evidence of damaged slate shingles was observed at some buildings.

It was reported that the property underwent major breezeway repairs in 2018, consisting of replacing damaged wood at platforms and stairwells, rebuilding sections that were sagging or failing, or complete replacement of stairs/platforms. However, there are still sections of stairs/platforms that will require repairs. We observed loss of paint, weathering/rot, isolated damaged fascia and railings, and damaged undersides of the stairs/platforms that have been secured with metal screens. The damaged undersides of the platforms and stairs do not appear to present an imminent life safety issue at this time but will require repairs/replacement at this time. An allotment has been included in the Immediate Repairs for façade repairs. This estimate includes a rough average cost per building. Not all of the aforementioned façade conditions appear to require immediate attention. Some of the aforementioned deficiencies can be handled as part of the ongoing façade maintenance repairs included in the Replacement Reserves. |
| Replace older pitched roof | 1700 | SF | $3.00 | $5,100 | The asphalt shingles on the single building with the older pitched roof were observed in poor condition (the shingles have reached the end of their EUL). As such, in order to avoid any possible leaks, the older pitched roof should be replaced at this time |
| Fire Suppression - Inspecting and retagging fire extinguishers | 30 | Per Building | $150.00 | $4,500 | The inspection certificates for the fire extinguisher equipment were reviewed as expired. An allotment has been included in the Immediate Repairs for inspecting and retagging the fire extinguishers throughout the subject property. |
| Dwellings - Complete unit turns | 3 | EA | $5,000.00 | $15,000 | Units 1443-3, 1446-5, and 1424-4 were in the process of being renovated at the time of the site visit. Evidence of ongoing painting and caulking was observed in units 1443-3 and 1424-5. Evidence of ripped up carpeting and replacement flooring finishes was observed in Unit 1446-5 (appliances were stored in this unit but have not been installed). Missing acoustic tile ceiling finishes were observed in Unit 1424-5. An allotment has been included in the Immediate Repairs for completion of the turns in these three dwellings. |
| **Total Immediate Repairs** | | | | **$147,000** | |